FARNSWORTH ET AL., TRUSTEES, *v.* MINNESOTA AND PACIFIC RAILROAD COMPANY ET AL.

1. On the 3d of March, 1857 (11 Stat. 195), Congress passed an act granting certain lands to the Territory of Minnesota, for the purpose of aiding in the construction of several lines of railroad between different points in the Territory. The act declared that the lands should be exclusively applied to the construction of that road on account of which they were granted, and to no other purpose whatever; and that they should be disposed of by the Territory or future State only as the work progressed, and only in the manner following: that is to say, a quantity of land, not exceeding one hundred and twenty sections for each of the roads, and included within a continuous length of twenty miles of the road, might be sold; and when the governor of the Territory or the future State should certify to the Secretary of the Interior that any continuous twenty miles of any of the roads were completed, then another like quantity of the land granted might be sold; and so, from time to time, until the roads were completed. *Held,* that the

construction of portions of the road on account of which lands were granted, as thus designated, was a condition precedent to a conveyance by the Territory or future State of any of the lands beyond the first one hundred and twenty sections. Accordingly, an act of the Territory, transferring to a railroad company these lands in advance of any work on its road, only conveyed title to the first one hundred and twenty sections.

2. Where a grant of land and connected franchises is made to a corporation for the construction of a railroad by a statute, which provides for their forfeiture upon failure to perform the work within a prescribed time, the forfeiture may be declared by legislative act without judicial proceedings to ascertain and determine the failure of the grantee. Any public assertion by legislative act of the ownership of the State after the default of the grantee — such as an act resuming control of the road and franchises, and appropriating them to particular uses, or granting them to another corporation to perform the work — is equally effective and operative.

APPEAL from the Circuit Court of the United States for the District of Minnesota.

On the 3d of March, 1857 (11 Stat. 195), Congress passed an act granting certain lands to the Territory of Minnesota, for the purpose of aiding in the construction of several lines of railroad between different points in the Territory. These lands were to consist of the alternate sections, designated by odd numbers, for six sections in width, on each side of the several lines of road, and were to be selected within fifteen miles therefrom. The act declared that the lands should be exclusively applied to the construction of that road on account of which they were granted, and to no other purpose whatever; and that they should be disposed of by the Territory or future State only as the work progressed, and only in the manner following: that is to say, a quantity of land, not exceeding one hundred and twenty sections for each of the roads, and included within a continuous length of twenty miles of the road, might be sold; and when the governor of the Territory or the future State should certify to the Secretary of the Interior that any continuous twenty miles of any of the roads were completed, then another like quantity of the land granted might be sold; and so, from time to time, until the roads were completed; and that, if any of the roads were not completed within ten years, no further sales should be made, and the lands unsold should revert to the United States.

On the 19th of May of the same year the Territory accepted the grant thus made upon the terms, conditions, and re-

strictions contained in the act of Congress, and, on the 22d of the month, passed an act for the execution of the trust. By that act it authorized four different companies to construct the roads in aid of which the congressional grant was made, each company a distinct road.   Three of these companies were at the time in existence : one of them, the Minnesota and Pacific Railroad Company, was created by the act.   This latter company was authorized to construct the road from Stillwater, by way of St. Paul and St. Anthony, to the town of Breckenridge, on the Sioux Wood River, with a branch from St. Anthony to St. Vincent, near the mouth of the Pembina River ; and, for the purpose of aiding in its construction, the act granted to the company the interest and estate present and prospective of the Territory and of the future State in the lands granted by Congress along the line of the road, subject, however, to the proviso that the title of the lands should vest in the company, as follows : Of the first one hundred and twenty sections, whenever twenty or more continuous miles of the road should be located, and the governor should certify the same to the Secretary of the Interior ; and afterwards of a like number of sections, whenever and as often as twenty continuous miles of the road should be completed so as to admit of running regular trains, and the governor should certify the fact to the Secretary.

By the same act, the company was authorized to borrow money and to execute its bonds and mortgages and other obligations for the same, or for any liabilities incurred in the construction, repair, equipment, or operating of the line, upon any part of its railroad or branches, and upon the estate granted by the act, and upon any or all of its other property.

The company organized under the act, and accepted the grant made by its provisions upon the terms and conditions mentioned, and, during the year, had the greater part of the line of its road surveyed and located, and maps of the same filed with the governor of the Territory and the commissioner of the General Land-Office at Washington.   The location was approved by the Secretary of the Interior ; and, by his directions, the lands granted along the line were withdrawn from sale and settlement.   A contract, as alleged, was also made with a responsible party for the construction of the main line

of the road; but work under it was only prosecuted for a month, when it was abandoned. No portion of the road was completed; and the failure of the company in this respect was ascribed to the general embarrassed financial condition of the country, in consequence of which it was unable to raise the necessary funds to proceed with the work.

The Territory of Minnesota became a State in October, 1857, though not admitted into the Union until May, 1858. Its constitution prohibited the loan of the State credit in aid of any corporation; but the first legislature assembled under it, being desirous of expediting the construction of the lines of the road in aid of which the congressional grant was made, proposed, in March, 1858, an amendment to the constitution, removing this prohibition so far as the four companies named in the act of May 22, 1857, were concerned. The amendment was submitted to the people, and, on the 15th of April of the same year, was adopted. This amendment provided that the governor should cause to be issued and delivered to each of the four companies special bonds of the State to the amount of $1,250,000, in instalments of $100,000, as often as any ten miles of its road was ready for placing the superstructure thereon, and an additional instalment of the same amount as often as that number of miles of the road was fully completed and the cars were running thereon, until the whole amount authorized was issued. The bonds were to be denominated Minnesota State Railroad Bonds; were to draw interest at the rate of seven per cent per annum, payable semi-annually in the city of New York; were to be transferable by indorsement of the president of the company, and redeemable at any time after ten and before the expiration of twenty-five years from their date; and for the payment of the interest and the redemption of the principal the faith and credit of the State were pledged. The amendment at the same time with this pledge declared that each company should make provision for the redemption of the bonds received by it, and payment of the interest accruing thereon, so as to exonerate the treasury of the State from any advances of money for that purpose; and, as security therefor, required the governor, before any bonds were issued, to take from each company an instrument pledging the net profits of

its road for the payment of the interest, and a conveyance to the State of the first two hundred and forty sections of land, free from prior incumbrances, which the company was or might be authorized to sell, to protect the treasurer against loss on the bonds; and also required, as further security, that an amount of first-mortgage bonds on the roads, lands, and franchises of the company, corresponding in amount to the State bonds issued to it, should be transferred to the treasurer of the State with the issue of the State bonds.   The amendment declared, that, in case either company made default in the payment of the interest or principal of the bonds issued to it, no more State bonds should be thereafter issued to that company, and that the governor should proceed to sell, in such manner as might be prescribed by law, its bonds, or the lands held in trust, or require a foreclosure of the mortgage executed to secure the bonds.   The amendment further provided, that, in consideration of the loan, each company which accepted the bonds should, as a condition thereof, complete not less than fifty miles of its road on or before the expiration of the year 1861, and not less than one hundred miles before the year 1864, and four-fifths of the entire length of its road before the year 1866 ; and that any failure on the part of the company to complete the number of miles of its road in the manner and within the several times thus prescribed should forfeit to the State all the rights, title, and interest of any kind whatsoever in and to any lands granted by the act of May 22, 1857, together with the franchises connected with the same, not pertaining or applicable to the portion of the road by it constructed, and a fee-simple to which had not accrued to the company by reason of such construction.

The Minnesota and Pacific Railroad Company, after the proclamation of the governor of its adoption, accepted the amendment, and gave notice to the governor of its acceptance, and that it proposed to avail itself of the loan which the amendment provided.

On the 31st of July, 1858, the company executed to certain trustees named therein a deed of all that portion of its lines of road in aid of which the lands had been granted, and of the lands and alienable franchises connected therewith, in

trust for the holders present and prospective of twenty-three millions of bonds to be issued under certain restrictions. Nine hundred of these bonds were subsequently issued as therein provided, and some of them were put in circulation. The present suit is brought by the surviving trustees to obtain a decree that this deed is a valid and subsisting lien prior to all other liens and incumbrances upon all the lands, property, and franchises described therein, and to enforce the same.

Subsequently, during that year, the company graded thirty miles of its road, and made it ready for the superstructure, and thereupon executed the pledge of net profits, and the conveyance of two hundred and forty sections as provided by the constitutional amendment. But, in place of first-mortgage bonds secured by a separate deed of trust, the company offered $300,000 of its bonds secured by the trust-deed mentioned of July 31, 1858, and applied for State bonds of an equal amount. The governor refused to issue the State bonds until a deed of trust was executed specifying a priority of lien of the bonds which the company might deliver to the State. This refusal led to a great deal of controversy and some litigation with the governor; but ultimately, on the 27th of November, 1858, a supplemental deed of trust was executed by the company, authorizing and directing, in case of default in the payment of the interest or principal of its bonds delivered to the State, a foreclosure and sale by the trustees upon the demand of the governor, and, in case of their failure or refusal upon his demand, authorizing the governor to make such foreclosure and sale. The governor then issued to the company bonds of the State to the amount of $300,000. Subsequently, during that and the following year (1859), thirty-two and one-half miles more of the road were graded and ready for its superstructure, and $300,000 more of bonds of the State were issued to the company, and a corresponding amount of the first-mortgage bonds of the company were delivered to the treasurer. The interest on the State bonds was payable on the first days of June and December, and the interest on the company's bonds was payable on the first days of February and August, of each year.

The company made default in the payment of interest on

the State bonds delivered to it, falling due in December, 1859; and the governor demanded of the trustees, in the deed of July 31, 1858, that they should proceed to foreclose the same, and sell the trust-property. With this demand the trustees never complied.

The company also made default in the payment of interest upon its own bonds delivered to the State, due on the 1st of February, 1860. The legislature accordingly, in March following, passed an act making it the duty of the governor to foreclose the deed of trust, if in his opinion the public interest required it, and, upon a sale of the property, rights, and franchises covered by the deed, to bid in the same for the State.

The legislature at about the same time proposed an amendment of the constitution of the State prohibiting any law, which levied a tax or made other provisions for the payment of interest or principal of the State bonds issued to the company, from taking effect until the same had been submitted to a vote of the people and been adopted; and also prohibiting any further issue of bonds to the company under the amendment of April 15, 1858, and abrogating that amendment with a reservation to the State of all rights, remedies, and forfeitures accruing thereunder. This amendment was adopted in November, 1860. Whilst it was pending before the people, the governor proceeded under the act of the legislature, and had the property covered by the trust-deed of the company, with the connected franchises, advertised and sold, the same being purchased on behalf of the State. The sale took place on the 23d of June, 1860.

In March, 1861, the legislature passed an act, by which the road, lands, rights, and franchises possessed by the company previous to the sale, and all bonds and securities of the company held by the State, were upon certain conditions "released, discharged, and restored" to the company, free from all liens or claims of the State. These conditions required the construction and equipment of certain portions of the road within designated periods. One of the conditions provided that the company should construct and put in operation, and fully equip for business, that portion of the main line extending from St. Paul to St. Anthony, on or before the first day of the following January, in default of which all the rights

and benefits conferred upon the company by virtue of the act should be " forfeited to the State absolutely, and without further act or ceremony whatever ; " and, in case the company should fail to construct the other and further portions of the road and branches within the time or times designated, it should forfeit to the State, in like manner, all the lands, property, and franchises pertaining to the unbuilt portions of the road and branch; and in either case, or in any forfeiture under the provisions of the act, the State should hold and be possessed of all the lands, property, and franchises forfeited, " without merger or extinguishment, to be used, granted, or disposed of, for the purpose of aiding and facilitating the construction of said road and branch."

This act the company accepted with all its conditions; but it never completed the portion of the road there designated to be put into operation before the first of the following January, or any portion of its road, as there provided, or as provided in the constitutional amendment of 1858; and on the 10th of March, 1862, the legislature, acting upon the forfeiture accruing, or supposed to be accruing, from the failure of the company in this respect, passed an act creating the St. Paul and Pacific Railroad Company, and granted to it all the rights, benefits, privileges, property, franchises, and interests of the Minnesota and Pacific Railroad Company acquired by the State by virtue of any act or agreement of the company, or any thing done or suffered by it, or by virtue of any law of the State or Territory, or of the constitution of the State, or from the sale made by the governor, and also all the rights, privileges, franchises, lands, and property granted to the company by the act of May 22, 1857. The new company, and a division company subsequently created out of it, have since constructed the main line of the road and a portion of the branches, and, to enable them to do so, have made various deeds of trust and mortgages upon the assumption that the rights of the old Minnesota and Pacific Railroad Company had ceased. These deeds of trust and mortgages amount to many millions of dollars, and are outstanding. These companies and the holders of their bonds, of course, resist the enforcement of the deed of trust in suit. The questions for determination relate, *first,* to the validity of this

deed at the time it was executed, or rather to the right of the company to include therein and bind all the lands granted by the act of the Territory of May 22, 1857 ; and, *second*, to the effect of the act of March 10, 1862, upon the title of the property and connected franchises embraced in the deed of trust.

*Mr. Henry F. Masterson* for the appellant.

The court below erred in holding, that, under the act of Congress, the legislature could not authorize the trust-deed, in advance of the construction of the road, so as to give a lien on all the lands, as against the State and her subsequent grantees " who actually built the road and earned the land," with notice of said deed.

As the lands were granted " to aid in the construction of the road," they could not effectually be so used except as a basis of credit and security. All previous grants for similar purposes, covering a period of over thirty years, had been made available and used in this way. *Trustees of Wabash & Erie Canal Co.* v. *Beers*, 2 Black, 448. Congress must, therefore, have intended such use.

The act of March 3, 1871 (16 Stat. 588), is a construction by Congress of the act making the grant, and shows that it was understood as authorizing the incumbering of the lands in advance of the construction of the road. A like legislative construction will be found in the act of March 3, 1873. 17 id. 634.

If, therefore, by the true construction of the act of March 3, 1857 (11 Stat. 195), it was lawful to mortgage, or to convey in trust, the lands, in order to raise money with which to construct the road, it then follows that such an instrument is an effectual and valid security for such money, whether the road was wholly completed with it or not ; otherwise a subsequent lender and junior mortgagee would not only have the first lien, but the whole security. *Galveston Railroad* v. *Cowdrey*, 11 Wall. 459 ; *United States* v. *New Orleans Railroad*, 12 id. 362 ; *Dunham* v. *Railroad Company*, 1 id. 254. The true construction, however, of the act of Congress, in this regard, is immaterial. The United States does not complain, and no other party can. *Baker* v. *Gee*, 1 Wall. 333–337 ; 2 Bl. Com. 155 ; 4 Kent, 127 ; *Nicoll* v. *N. Y. & Erie Railroad Co.*, 2 Kern. 121–140 ; *Lamb* v. *Davenport*, 18 Wall. 307.

If the lenders took the risk of losing their security by reason of a forfeiture or a reversion to the United States, they assumed no such risk toward the State. Such title as she might acquire by forfeiture would be subject to the lien, (2 Bl. Com. 267; 4 id. 381–384; 4 Kent, 427); and the twenty-first section of the act incorporating the Minnesota and Pacific Railroad Company especially estopped her from claiming adversely to the trust any of the fund. A contract at once arose between the lenders and the State that she would not withdraw any of the fund, or impair their security. *Curran* v. *Arkansas*, 15 How. 304; *Hawthorn* v. *Calef*, 2 Wall. 10; *Von Hoffman* v. *City of Quincy*, 4 id. 535; *Woodruff* v. *Trapnal*, 10 How. 190; *Barings* v. *Dabney*, 19 Wall. 9; *Trustees of Dartmouth College* v. *Woodward*, 4 Wheat. 518.

The State having, by the sixteenth section of the charter, granted all her expectant or prospective interest in the land, she and her subsequent grantees are estopped from denying her title or that of her original grantee. If these sections have no other force and effect, they operate as a lawful and sufficient power to create the lien; and the State is equally bound as if the trust had been made by one of her executive officers acting under like legislative authority.

The court erred in holding that the State of Minnesota, or any one but the United States, could take advantage of the breach of conditions of the congressional grant, or be heard to object that said trust-deed was not authorized by the act. The United States was the grantor. Conditions can only be reserved for the benefit of the grantor and his heirs: these conditions will be held to have been waived, unless re-entry or its equivalent is made. 2 Bl. Com. 155; 4 Kent, 127; *Baker* v. *Gee*, 1 Wall. 333; *Smith* v. *Sheeley*, 12 id. 358; *Lamb* v. *Davenport*, 18 id. 307; *Nicoll* v. *N. Y. & E. R.R. Co.*, 2 Kern. 121–140.

The estoppel which precluded the State from denying the validity of the trust-deed extended to her subsequent grantees, because they not only took with notice, but paid nothing for the franchises, road-bed, and property acquired before the passage of the act of 1862.

The court was in error in holding, in effect, that the legislature could not authorize such trust-deed in advance of the

construction of the road and the acquisition of other property than that derived through the United States, so as to be a lien upon the road when constructed, and upon said other property when acquired.

It is settled law, that a railroad mortgage like that in question, although made before the construction of the road, attaches itself thereto as the work thereon is built, and to all subsequently acquired property of the company. *Galveston Railroad* v. *Cowdrey,* and *Dunham* v. *Railway Company, supra.*

The court was also in error in holding that there was or could be any forfeiture under or by force of the constitutional amendment in any way when taken in connection with the facts stated in the bill, and in holding, that, in any event, title could be acquired by such forfeiture without judicial process and judgment.

The constitutional amendment is not a deed or a legislative grant. Its conditions are, therefore, not conditions in deed. It created no estate whatever in any thing embraced by the trust-deed, as the condition of forfeiture is not attached to and does not accompany the grant upon which it is to operate, and cannot be taken advantage of by re-entry or legislative act. Litt., sect. 325; 2 Bl. Com. 154; 4 Kent, 123. Nor is it a condition in law in the sense that it is *implied* (Litt., sect. 378; 2 Bl. Com. 153; 4 Kent, 120; *Davis* v. *Gray,* 16 Wall. 223), or one which the State may in its own right annex to any or all property which a person has or may acquire, whether from her or another source; *ex. gr.,* a condition of forfeiture for crime or negligence. 2 Bl. Com. 267, 420; 4 Kent, 426. Even if it were a condition in law, in this sense, the forfeiture would not avoid the incumbrance. 2 Bl. Com. 421; 4 id. 381, 387; 4 Kent, 427.

The amendment was a contract of lending. The thing loaned was the credit of the State. The security was a pledge of the net profits of the road, a conveyance in trust of the first two hundred and forty sections of land under the congressional grant, and a portion of the first-mortgage bonds of the company to be issued under sect. 21 of its charter. The provision, that, in consideration of the loan, the company should construct its roads within a specified time, was intended as a penal pro-

vision *in terrorem*, and not for the purpose of further security and indemnity against loss on account of the loan, but as security for an *extra* diligent user of the franchises, and indemnity for a *non-extra* diligent use.

The forfeiture being for a non-extra diligent use, and no special remedy or mode of taking advantage of it provided, the State was left to the common-law remedy of judicial process and judgment. It could be enforced in no other way. *Davis* v. *Gray*, 16 Wall. 232; *Curran* v. *Arkansas, supra; Mumma* v. *Potomac Co.*, 8 Pet. 281.

Conceding that this provision for forfeiture was of the nature of a condition in deed, and could be taken advantage of without judicial action, it still remains true that the State lost the right to it, and barred even the judicial remedy, by her own illegal acts, and first and continued breach of the contract which created the condition.

The act of March 8, 1861, with its acceptance by the company, was a mutual rescission, and an agreed abandonment of all prior contracts, engagements, and obligations; a waiver and release of all previous defaults and forfeitures, if any there were; and a new contract in the premises, taking the place of the constitutional amendment.

The court erred in holding that the act of March 10, 1862, was intended as an enforcement or taking advantage of the condition of forfeiture in the constitutional amendment, because the State wished and intended to take under the act of 1861 "without merger or extinguishment."

This act of 1862 cannot stand as an equivalent for re-entry for a breach of condition in a deed, because the constitutional amendment was not such an instrument. It is not competent for the legislature, by its own act, to seize property for a breach of conditions which are imposed by a statute. While a legislative declaration may be equivalent to re-entry, a re-entry will not avoid a grant from strangers; nor an estate from the grantor, except it be conveyed by his deed containing the condition.

The only ground upon which the act of 1862 can be upheld is, that it was taking advantage of the forfeiture provided in the act of 1861, which took effect of itself, upon the happening

of the event.   This forfeiture, it is conceded, would not affect the rights of bondholders secured by the prior deed of 1858.

The court erred in holding that the act of March 10, 1862, created a new corporation ; and that the St. Paul and Pacific Company is not the same corporate entity as the Minnesota and Pacific Company, and so liable for its debts.   The State, by the act of March, 1861, evidently intended, if she should take by forfeiture at all, to take under the provisions of that act. A change in the succession of corporators does not change the corporation in its existence or liabilities, no matter how such change is brought about; and because the St. Paul and Pacific Railroad Company and its successors have succeeded to and hold the franchise to be a corporation, created by the charter of May 22, 1857, they are in law the same being; the same invisible, incorporeal, personal entity; and so liable for its debts.   2 Kent Com., Lect. 33 ; 2 Bl. Com. c. 18; id. c. 3, p. 37. Story, J., in *Trustees of Dartmouth College* v. *Woodward, supra.*

Two things should be presumed by this court : first, that the legislature did not intend a violation of the provision of the Constitution which prohibited the formation of corporations of this character by special act (Const. of Minn., art. 10, sect. 2); second, that it intended that the grantees of said act of 1862, and their successors, perpetually, should have and enjoy all the rights and franchises conferred on the stockholders of the Minnesota and Pacific Company by the act of 1857.   These premises necessitate the conclusion, that the grantees and their successors of the act of 1862 stand in the shoes of the corporators of the act of 1857.

If this is not the logical, legal conclusion from the premises, where and how do the stockholders and their successors of the St. Paul and Pacific Railroad Company get their corporate entity ?

The State authorized the trust in question, and took the property charged with it.   If the supplement and foreclosure were valid as between the State and the company, the lien of other bondholders was unaffected thereby , that is, all that the State did or could acquire were the rights and interests of the mortgagor, the company; because she paid nothing, but took

or attempted to take the whole trust-fund for the interest due upon her own bonds, without payment, or provision for payment, or *pro rata* payment, of the interest due to other bondholders. " It would be against the principles of equity to allow a single creditor to destroy a fund to which other creditors had a right to look for payment." *Gue* v. *Tide - Water Canal Co.*, 24 How. 263.

*Mr. H. R. Bigelow* and *Mr. William H. Scott* for the appellees.

No part of the lands embraced by the congressional grant vested in the Minnesota and Pacific Railroad Company, inasmuch as the road was not *constructed*. *Schulenberg* v. *Harriman*, 21 Wall. 44.

But conceding that, at the date of the trust-deed, the company possessed a mortgageable interest in the lands and in her franchises and present and future property, they all became forfeited to the State under the constitutional amendment of April 15, 1858, by reason of the non-completion of the road within the specified time.

This forfeiture is a complete bar and defence to the present action.

The constitutional amendment, the acceptance thereof by the company, and her receipt of State bonds thereunder, amounted together to an amendment, with her consent, of her charter, whereby the provision of forfeiture was incorporated in that instrument. The rule in *Trustees of Dartmouth College* v. *Woodward*, 4 Wheat. 518, and other decided cases, that no alteration impairing the obligations of the charter of a corporation can be made by the legislature of a State, is laid down with the express qualification that such alteration must be " without the consent of the corporation." The consent was, in this case, founded upon a valuable consideration, — the issue of State bonds to the amount of $600,000.

If the ancient rule of the common law — that, as to things executed, a condition must be created and annexed to the estate at the time of the making of it, and not at any time thereafter — is still in force, this case, even viewed as between individuals, is still within the distinction laid down by Coke (Inst. 236). The grant was entirely conditional upon the re-

quired completion of the road. The estate of the company was, therefore, a purely " executory inheritance." Even if the rule could be held to apply to a grant by a *State*, its application is entirely superseded by the provisions of the constitutional amendment. They were designed to secure the completion of the road, or specified portions, within the time prescribed, by enabling the State, in case of default, to resume the franchises and lands pertaining to the uncompleted portion, or the whole if twenty miles had not been completed, and to seek other agencies or means for accomplishing the end in view. The reversion to the general government, provided for in the act of Congress making the grant, might be thus prevented.

The forfeiture is, moreover, maintainable upon strictly equitable grounds. It was the express contract of the parties, based upon a good, valuable, and adequate consideration. Respecting the State, the company was a mere donee. It received a most liberal grant of franchises and lands, and a loan of the credit of the State, upon the sole condition that it should proceed with the construction and completion of the road with the despatch required by the Territorial and State grants. This it undertook to do. Such completion within the time prescribed was not a collateral or incidental, but the exclusive, purpose of the amendment. Any default in this respect admitted neither compensation nor restoration of the *status in quo*. 2 Story's Eq. Jur., sects. 1314, 1316, 1324; *Peachy* v. *The Duke of Somerset*, 1 Str. 447, 453.

The forfeiture will be sustained (1.) because it was imposed by statute. 2 Story's Eq. Jur., sect. 1326; *Peachy* v. *The Duke of Somerset, supra; Keating* v. *Sparrow*, 1 Ball & B. 373. (2.) Upon considerations of public policy. Upon the same principle, courts of equity have refused relief against forfeitures incurred under the by-laws of corporations for the non-payment of stock-subscriptions. 2 Story's Eq. Jur., sect. 1325; *Sparks* v. *Liverpool Waterworks Company*, 13 Ves. 428. (3.) Because the case was one where time was emphatically of the essence of the contract. *Dunklee* v. *Adams*, 20 Vt. 415; *Baldwin* v. *Van Vorst*, 2 Stock. Ch. 517; 3 Lead. Cas. in Eq. 672. (4.) On account of the insolvency of the Minnesota and Pacific Railroad Company at the time the forfeiture was asserted

and declared by an act of the legislature of the State of Minnesota of the 10th of March, 1862, and of its conceded inability to complete the road as required. *Dunklee* v. *Adams, supra.*

In so far as the present action seeks to establish a lien in favor of the complainants, as trustees, upon the railroad constructed, and the property and appurtenances acquired by the St. Paul and Pacific Railroad Company, it must wholly fail. There is no privity whatever between that company and the Minnesota and Pacific Railroad Company in respect to the railroad, property, or acquisitions of the former company.

Although it must now be regarded as the settled doctrine of this court, that a mortgage executed by a railroad company, conveying and covering its subsequently acquired property, will render such property subject to the mortgage, *pari passu*, with its acquisition, yet it is equally well settled that this is so only " as against the company and its privies," and only as fast as the property covered by the terms of the mortgage " comes into existence as property of the company." *Galveston Railroad* v. *Cowdrey*, 11 Wall. 459.

Even this doctrine is somewhat of an innovation upon the established maxim of the common law, that " a person cannot grant a thing which he has not." It has been allowed, in regard to railroad mortgages, upon considerations compounded both of equity and of public policy; and is, therefore, not to be extended.

The St. Paul and Pacific Railroad Company is in no privity whatever with the Minnesota and Pacific Railroad Company. It derives its title to all its property and franchises by a grant from the State of Minnesota in hostility to and in forfeiture of the title of the latter company.

The two companies are not, under different names, the same company. This has been expressly determined by the highest court of the State of Minnesota; and that adjudication, involving as it does a direct construction of the object and effect of an act of the legislature of that State, will be adopted and followed by this court. ·

MR. JUSTICE FIELD, after making the foregoing statement of the case, delivered the opinion of the court.

The act of Congress granting lands to the Territory of Minnesota imposed conditions upon their alienation, except as to the first one hundred and twenty sections, which the Territory could not disregard.  It declared that the lands should be exclusively applied to the construction of the road in aid of which they were granted, and to no other purpose whatever, and should be disposed of only as the work progressed.  It provided that their sale should be made in parcels as specified portions of the road were completed, and only in that manner.  The evident intention of Congress was to secure the proceeds of the lands for the work designed, and to prevent any alienation in advance of the construction of the road, with the exception of the first one hundred and twenty sections.  The act made the construction of portions of the road a condition precedent to a conveyance of any other parcel by the State.  No conveyance in disregard of this condition could pass any title to the company.  It was so held by this court in *Schulenberg* v. *Harriman*, 21 Wall. 44, where we had occasion to consider provisions of a statute identical in terms with the one before us.

The act of May 22, 1857, passed in advance of any work on the road, conveyed, therefore, no title to the Minnesota and Pacific Railroad Company in the lands granted by Congress beyond the first one hundred and twenty sections.  Of course, the mortgage, or deed of trust, subsequently executed by that company, so far as it covered such lands, was inoperative for any purpose.

Whatever interest passed to the company in the one hundred and twenty sections was subject to forfeiture under the constitutional amendment of April 15, 1857.  That amendment, which the company voluntarily accepted, provided, as already stated, that upon failure to complete certain portions of the work within prescribed periods it should forfeit these lands, and all other lands held by it, with the connected franchises, except such lands as were acquired by construction of portions of the road.  The parcels thus earned were excepted from forfeiture. It was certainly competent for the company to subject its property, rights, and franchises conferred, or attempted to be conferred, by the act of May 22, 1857, or derived from any other source, to this liability.  Its assent in this respect was one of

the conditions upon which it received the loan of the State credit provided by the constitutional amendment. When the assent was given, the relation of the State to the land and connected franchises was precisely as though the condition had been originally incorporated into the grant. The mortgage or deed of trust not having been executed until after the amendment was accepted, and the holding of the lands of the company, with its rights, privileges, and franchises, having been thus made dependent upon the completion of the road within the periods prescribed, the beneficiaries under that instrument took whatever security it afforded in subordination to the rights of the State to enforce the forfeiture provided. That forfeiture was enforced by the act of the legislature of March 10, 1862; unless we are to presume that at the sale made in 1860 by the governor, under the act of March of that year, and the supplemental deed of trust, the entire interest and right of the company were acquired by the State. It is averred in the bill of complaint that this sale was void, and that it was so adjudged by a district court of the State. If this adjudication was valid, and the sale was void, the forfeiture provided by the constitutional amendment was enforced by the act mentioned. A forfeiture by the State of an interest in lands and connected franchises, granted for the construction of a public work, may be declared for non-compliance with the conditions annexed to their grant, or to their possession, when the forfeiture is provided by statute, without judicial proceedings to ascertain and determine the failure of the grantee to perform the conditions. Such mode of ascertainment and determination — that is, by judicial proceedings — is attended with many conveniences and advantages over any other mode, as it establishes as matter of record, importing verity against the grantee, the facts upon which the forfeiture depends, and thus avoids uncertainty in titles, and consequent litigation. But that mode is not essential to the divestiture of the interest where the grant is for the accomplishment of an object in which the public is concerned, and is made by a law which expressly provides for the forfeiture when that object is not accomplished. Where land and franchises are thus held, any public assertion by legislative act of the ownership of the State, after default of the grantee, —

such as an act resuming control of them and appropriating them to particular uses, or granting them to others to carry out the original object, — will be equally effectual and operative.  It was so decided in *United States* v. *Repentigny*, 5 Wall. 211, and in *Schulenberg* v. *Harriman*, 21 Wall. 44, with respect to real property held upon conditions subsequent.  In the former case, the court said that " a legislative act directing the possession and appropriation of the land is equivalent to office found. The mode of asserting or of resuming the forfeited grant is subject to the legislative authority of the government.  It may be after judicial investigation, or by taking possession directly under the authority of the government without these preliminary proceedings."  And there would seem to be no valid reason why the same rule should not apply to franchises held in connection with real property, and subject to like conditions, where the franchises were created for the purpose of carrying out the public object for which the real property was granted.

In this case there were special reasons for the provision for a forfeiture, and for its immediate enforcement by the State, in case of the grantee's failure to construct designated portions of the road within the time prescribed.  The act of Congress provided, that, in case the road was not completed within ten years, the lands of the grant then remaining unsold should revert to the United States.  It was, therefore, necessary for the State to see that the construction of the road was commenced and pushed forward without unnecessary delay, to prevent a possible loss of portions of the grant.  By the clause of forfeiture, the State was enabled to retain such a control over the lands and connected franchises, that, in case the company failed to build the road in time, it could make arrangements with other companies or parties for that purpose.  This control would have been defeated if the State had been subjected to the delay of judicial proceedings before a forfeiture could have been enforced.  The entire grant would have been lost to the State whilst such proceedings were pending.  A more summary mode of divestiture was therefore essential, and was contemplated by the parties.

The only inconvenience resulting from any mode other than by judicial proceedings is that the forfeiture is thus left open

to legal contestation, when the property is claimed under it, as in this case, against the original holders.

But it is said that provisions for forfeiture are regarded with disfavor and construed with strictness, and that courts of equity will lean against their enforcement.   This, as a general rule, is true when applied to cases of contract, and the forfeiture relates to a matter admitting of compensation or restoration ; but there can be no leaning of the court against a forfeiture which is intended to secure the construction of a work, in which the public is interested, where compensation cannot be made for the default of the party, nor where the forfeiture is imposed by positive law.   " Where any penalty or forfeiture," says Mr. Justice Story, " is imposed by statute upon the doing or omission of a certain act, there courts of equity will not interfere to mitigate the penalty or forfeiture, if incurred; for it would be in contravention of the direct expression of the legislative will."   Story's Eq. Jur., sect. 1326.   The same doctrine is asserted in the case of *Peachy* v. *The Duke of Somerset*, reported in 1st Strange, and in that of *Keating* v. *Sparrow*, reported in 1st Ball & Beatty.   In the first case, Lord Macclesfield said that " cases of agreement and conditions of the party and of the laws are certainly to be distinguished.   You can never say that the law has determined hardly ; but you may that the party has made a hard bargain."   In the second case, Lord Manners, referring to this language and taking the principle from it, said that " it is manifest, that, in cases of mere contract between parties, this court will relieve when compensation can be given ; but against the provisions of a statute no relief can be given."

For these reasons, the forfeiture in this case declared by the legislature cannot be interfered with by the court.   But, as stated by counsel, the forfeiture will also be upheld on considerations of public policy, as well as from the impossibility of obtaining compensation from the railroad company for its default, on the same principle upon which courts of equity refuse to relieve against forfeitures incurred under the by-laws of corporations for the non-payment of stock-subscriptions.   To this subject Mr. Justice Story refers in his Commentaries, and after stating the general doctrine, that courts of equity will not

interfere in cases of forfeiture for the breach of covenants and conditions where there cannot be any just compensation for the breach, says, —

"It is upon grounds somewhat similar, aided also by considerations of public policy, and the necessity of a prompt performance in order to accomplish public or corporate objects, that courts of equity, in case of the non-compliance by stockholders with the terms of payment of their instalments of stock at the times prescribed, by which a forfeiture of their shares is incurred under the by-laws of the institution, have refused to interfere by granting relief against such forfeiture. The same rule is, for the same reasons, applied to cases of subscriptions to government loans, where the shares of the stock are agreed to be forfeited by the want of a punctual compliance with the terms of the loan as to the time and mode and place of payment."

The case of *Sparks* v. *The Liverpool Waterworks Company*, cited by counsel, is a strong illustration of this doctrine. 13 Ves. 428. The company there was incorporated to supply the town and port of Liverpool with water; and the property in and the profits of the undertaking were vested in the company in such shares and subject to such conditions as should be agreed upon. By articles of agreement, a committee of the company was authorized to call upon the shareholders for the several sums payable by them on their respective shares; and it was, among other things, provided, that in case any shareholder made default in the payment of his calls for twenty-one days after the time appointed, and for ten days after subsequent notice addressed to his then or last usual place of abode, his share or shares should be absolutely forfeited for the benefit of the other members of the corporation. The plaintiff was the owner of certain shares of stock in the company, upon which payment had been made upon thirty-four calls. The payment of the thirty-fifth call was omitted through his failure to receive personal notice of the call; it having been sent to his town residence whilst he was absent in the country, and not having been forwarded to him. For the non-payment upon the call his shares were declared forfeited. Immediately upon receiving information of the call, on his return to the city, he gave directions for its payment; and on the following day

the amount was sent to the bankers of the company. The committee of the company, however, informed him that they could give him no relief, as they had acted according to the laws of the company, from which no deviation could be made. The plaintiff thereupon filed a bill for relief against the forfeiture, on the grounds of accident, and that compensation might be made, and no injury be sustained by the company; his counsel also insisting upon the invalidity of the by-law, as unreasonable, exorbitant, and uncertain: but the court dismissed the bill, for the reason that the enterprise was a public undertaking, requiring for its successful prosecution punctuality of payment from the shareholders. Considerations of public policy forbade the granting of relief; for, as the court observed, "if this species of equity is open to the parties engaged in these undertakings, they could not be carried on."

The act of March 10, 1862, is a clear assertion of forfeiture of the estate, rights, privileges, and franchises of the Minnesota and Pacific Railroad Company. It grants all of them in express terms to the new company, and makes them in its possession subject to be forfeited to the State if the conditions annexed are not performed. And the failure of the original company to complete any portion of the road, as provided in the amendment of 1858, is not questioned by the complainants. Their position is, that the State had previously lost the right to a forfeiture by her own breaches of the amendment; that forfeiture could not be effected without judicial process and judgment; and that the forfeiture, if any accrued, was waived by the act of March 8, 1861, and its acceptance by the company.

The alleged breaches of the amendment by the State, at least such as are entitled to notice, consist in the refusal of the governor to receive the bonds of the company secured by the trust-deed of July 31, 1858, as the first-mortgage bonds required to be delivered to the treasurer in exchange for the State bonds, the exaction of the supplemental trust-deed, and the adoption of the constitutional amendment of November, 1860, abrogating the amendment of 1858, and prohibiting any law which levied a tax or made other provisions for the payment of the bonds of the State from taking effect until submitted to a vote of the people and adopted.

The amendment of 1858 evidently contemplated that the first-mortgage bonds of the company delivered to the treasurer in exchange for State bonds should be secured by a separate deed of trust, or at least by a deed which could be enforced by the governor, and not by a deed executed to parties over whom he could exercise no control. Whether the supplemental deed of trust was a sufficient compliance with the provision of the amendment, and whether it could create a priority of lien in favor of the bonds transferred to the State over bonds previously issued by the company to other creditors, it is unnecessary to determine. If defective or inoperative in either of these particulars, the objection cannot be raised by the company. Besides, if it could be considered as a matter of serious doubt whether the State was entitled to require a separate instrument of the character executed, its voluntary execution and acceptance by the governor and the subsequent exchange of bonds would seem to be a settlement of the question.

The adoption of the constitutional amendment of November, 1860, certainly had the effect to impair the value of the bonds of the State. But it is the holders of those bonds who had a right to complain of this proceeding, not the company or the trustees under the deed in suit. The holders of those bonds looked, in the first instance, to the State for their payment: the State was primarily liable to them; and they were, therefore, injuriously affected by the amendment. Whether the company was liable at all to the bondholders on the bonds from the indorsement of its president, it is unnecessary to determine: but, assuming such liability, then, as between the company and the State, the company was the principal debtor, and the State only a surety; and, with that relation existing, the company could not complain that the State, its surety, did not pay the bonds, interest or principal. And the trustees could not complain; for no right or contract between them and the company, or between them and the State, was impaired by the proceeding.

The amendment of 1858 prohibited any further issue of State bonds, whenever the company made default in meeting the interest on those issued. The withholding, therefore, of any further bonds, after such default, violated no contract of the State with the company; nor did it impair the right of the

State to enforce a forfeiture of its grant if the stipulated conditions as to the completion of the road were not complied with. After such default (no redemption from it having been made), all obligation of the State to the company ceased : its obligation remained only to its bondholders. That obligation still remains, and will remain until the pledge of its faith for the payment of the bonds is redeemed.

As to the alleged waiver of the forfeiture by the act of March 8, 1861, and its acceptance by the company, only a word need be said. The waiver, if the provisions of the act can be construed as such, was only conditional ; and the condition was not complied with. There had previously been, as already stated, a foreclosure and sale of the property, rights, and franchises of the company under its supplemental deed of trust, pursuant to the act of the legislature of the previous year; and, at the sale, the State had become the purchaser. The act of March 8, 1861, released and restored to the company the road, lands, rights, and franchises which it had possessed previous to the sale, and all bonds and securities of the company held by the State, free from all liens or claims thereon. The release and restoration were upon express conditions, one of which was that the company would construct and put into operation before the following January a designated portion of its road; and the act declared, that, upon the default of the company in this respect, all the rights and benefits conferred by virtue of the act should be " forfeited to the State absolutely, and without any further act or ceremony whatever," to be held by the State " without merger or extinguishment, to be used, granted, or disposed of, for the purpose of aiding and facilitating the construction of said road and branch." The designated portion of the road was not constructed within the prescribed period, and never has been constructed ; and it was with reference to the forfeiture provided for its default in this respect, as well as the forfeiture provided by the amendment of 1858, that the act of March 10, 1862, was passed. That act operated to divest the company of all interest in the one hundred and twenty sections of land and connected franchises transferred to it by the Territory in 1857, or subsequently acquired.

It follows from these views that the court below properly sustained the demurrer to the bill.    *Decree affirmed.*