## UNITED STATES v. TUJUNGA WATER & POWER CO.

### No. 6294.

Circuit Court of Appeals, Ninth Circuit.
April 6, 1931.
Rehearing Denied May 11, 1931.

Samuel W. McNabb, U. S. Atty., and Ignatius F. Parker, Asst. U. S. Atty., both of Los Angeles, Cal., and H. P. Dechant, Asst. to the Solicitor, U. S. Department of Agriculture, of San Francisco, Cal.

Donald M. Keith, of Los Angeles, Cal., for appellee.

Before RUDKIN, WILBUR, and SAWTELLE, Circuit Judges.

SAWTELLE, Circuit Judge.

This is an appeal from a decree in favor of the appellee, Tujunga Water & Power Company, denying forfeiture of a grant of right of way or easement on public lands comprised within the Angeles National Forest Reserve, county of Los Angeles, state of California.

As stated in the opinion of the trial judge (D. C.) 18 F.(2d) 120, 121, and the brief of the appellant: "In September, 1901, Samuel Merrills obtained approval of an application accompanied by a map of location covering a contemplated system of water conduits with a great number of storage reservoirs in the Tujunga Canyon. This contemplated system was of many miles in extent. One Wilcox, in 1905, obtained like approval of an application to construct a conduit line and reservoir, which application covered the final or lower section of the work indicated upon the prior map of Merrills. [The Los Angeles Mountain Water Co. also filed similar application.] On February 25, 1916, this defendant, which had acquired by transfer the rights of the prior locators, filed a map of definite description, covering what was designated as reservoir No. 1, being at the same location indicated for similar work on the Wilcox and Merrills maps. There were other maps of location filed at different times, covering intended work described under the extensive plan indicated on the Merrills map, but there was no contention at the trial that any section of that work had ever been commenced"—and the decree of the District Court in that respect was in favor of the appellant here.

Said Los Angeles Mountain Water Company also made application for the construction of a ditch, tunnel, and conduit lines on part of the lands in question, which application was duly approved by the Secretary of the Interior on May 28, 1910. As above stated, appellee, Tujunga Water & Power Company, successor in interest to all prior locators or permittees, on June 10, 1915, filed in the United States Land Office at Los Angeles a certain map on which appeared and was set forth a certain proposed reservoir site designated on the said map as "Reservoir Site No. 1" on the same location designated for similar work on previous applications. On February 25, 1916, this map was duly approved by the Secretary of the Interior. The evidence shows that during the year 1911, approximately five years prior to the time the latter application was approved, appellee as the successor in interest to the prior locators began the construction of a dam at dam site No. 1; that in the following year said dam was partially constructed to a height of 35 feet, which brought to the surface the waters of the underground stream above that point.

Appellee also purchased what is known as the Wilson tunnel for use in connection with said dam. This tunnel had its mouth at a point back of the concrete dam, was 6 or 7 feet in dimension, and extended for a distance of about 600 feet through a moun-

tain to a point below the dam where a conduit commenced. According to the testimony of one of the witnesses, "at certain seasons of the year temporary obstructions were thrown across the top of the dam to height of several feet, thereby causing the back waters to enter the mouth of the Wilson Tunnel and flow through the tunnel into the ditch and conduit system below the dam. * * * The floor level of the tunnel is about two feet high from the top of the permanent dam, but the placing of temporary obstructions across the top of the dam raises the water sufficiently to force it to flow through the tunnel."

There is no contention that appellee has added to the height of the dam since 1914 or 1915 when the water was actually diverted from the dam, and we think that it cannot fairly be said that the dam as constructed impounds any body of water, except to a very limited extent and then only the subterranean and percolating waters. As a matter of fact, "the stream continues to flow in its old course across the top of the dam," and certainly no such reservoir as set forth on the map and contemplated by the appellee and appellant was ever created.

The trial court said: "The issue is narrowed, therefore, so as to require a decision only as to whether the defendant and its predecessors, by the work that they caused to be performed under the permission given by the Interior Department, upon reservoir No. 1 and the contemplated tunnel and conduit system leading therefrom, created a practical storage place for the gathering of water and a means to conduct the same across the public lands, as their application promised they would do"—and held that "if, within the general plan outlined by the maps of location, substantial improvements are made, which are of practical use to an irrigation company in its business of supplying water to the inhabitants of the particular territory, the requirements of the statute are satisfied and the rights obtained may not be disturbed."

In our view of the case, we think this holding was error. An agreement was entered into between the government and the Tujunga Water & Power Company, the nature of which is shown by the appellee's map filed June 10, 1915. It is designated as "map, showing definite location of reservoir for the Tujunga Water and Power Company, Los Angeles County, California." The drawing shows a cross section of a dam with the caption "height of dam 115′.0." There is in-

dorsed on the map an affidavit of the engineer who was employed by appellee to make the survey of said reservoir the following: That the reservoir site covered 92.85 acres, and that the "survey of the said reservoir accurately represents a level line, which is the proposed water line of the said reservoir and * * * no lake or lake bed, stream or stream bed is used for the said reservoir, except as shown on this map."

There is also indorsed thereon an affidavit of the president and the secretary of said corporation to the effect that "the said reservoir as represented on this map and by said field notes was adopted by the company by resolution of its board of directors on the 10th day of June, 1915," that the total area to be covered is 92.85 acres, "and that the map has been prepared to be filed for the approval of the Secretary of the Interior in order that the company may obtain the benefits of sections 18 to 21 inclusive of the Act of Congress approved March 3, 1891, entitled 'An Act to Repeal Timber Culture Laws and for Other Purposes,' and section 2 of the act approved May 11, 1893, and I further certify that the right of way herein described is desired for the main purpose of irrigation."

The map also bears the approval of the Secretary of the Interior as of February 16, 1916.

■ The submission of this map by the appellant company and the approval of the details thereon by the Secretary of the Interior created a binding contract. It went further than a mere continuance of the grants to the precedent companies and a recognition of the work that had been done; it constituted a new obligation, a new understanding between the parties. A reservoir is defined by the Standard Dictionary as "a place where anything is kept in store; especially a place where water is collected and kept for use when wanted."

■ One of the conditions of the contract between the government and the appellee was the formation of a reservoir of the size and extent indicated on the map. It is agreed that the present dam does not impound a reservoir, and that its sole effect is to stop the flow of the waters in the gravel between the stream bed and bed rock; to the end of creating a large reservoir that would effectually conserve large quantities of water at present lost, the existing dam is quite ineffectual. There is no provision made for collecting the water, no provision for keeping it so that it

may be available whenever it may be required.

If two individuals had entered into an agreement whereby one was to receive certain rights over the property of the other, in return for which he agreed to build a dam 115 feet high and to create a reservoir covering 92.85 acres, and he did nothing to what had already been done and asserted merely that he had partially fulfilled his obligation by the fact that he could build sand piles on top of existing structures whenever he might think it necessary, no court of law or equity would hold that the obligation had been fulfilled and that the grantee had done what was required of him.

So to hold in the present case would be merely to state that, in any case in which the government grants certain rights in return for certain specified work to be done, the grantee is made the sole judge of the terms of the contract and is able to do as much or as little as he desires. If the government is generous enough to allow certain privileges to its citizens, it has the right to expect something in return; and, when the government makes a grant or an easement with the understanding that certain specifically noted things will be done, then the government has the right to exact compliance with the strict terms of the agreement.

The language of the statute is explicit on that point. Sections 18 to 21, inclusive, of the Act of March 3, 1891 (43 USCA §§ 946–949), in so far as material, are as follows:

"Section 18. The right of way through the public lands and reservations of the United States is hereby granted to any canal or ditch company * * * to the extent of the ground occupied by the water of the reservoir and of the canal and its laterals, and fifty feet on each side of the marginal limits thereof. * * *.

"Section 19. Any canal or ditch company desiring to secure the benefits of this act shall, within twelve months after the location of ten miles of its canal, if the same be upon surveyed lands, and if upon unsurveyed lands, within twelve months after the survey thereof by the United States, file with the register of the land office for the district where such land is located a map of its canal or ditch and reservoir; and upon the approval thereof by the Secretary of the Interior the same shall be noted upon the plats in said office, and thereafter all such lands over which such rights of way shall pass shall be disposed of subject to such right of way. * * *

"Section 20. * * * Provided, That if any section of said canal, or ditch, shall not be completed within five years after the location of said section, the rights therein granted shall be forfeited as to any uncompleted section of said canal, ditch, or reservoir, to the extent that the same is not completed at the date of the forfeiture.

"Section 21. Nothing in this act shall authorize such canal or ditch company to occupy such right of way except for the purpose of said canal or ditch, and then only so far as may be necessary for the construction, maintenance, and care of said canal or ditch."

The words of the statute must be read into and are an integral part of the contract. There is nothing here about "substantial improvements," nothing that says or implies that "it is not that the government is interested in having constructed works, conduits, and storage reservoirs of the exact and particular kind contemplated by the parties who make location of government land," but rather is there a clear statement that, "if any section of said canal, or ditch, shall not be completed" within the specified time allowed, the rights granted shall be forfeited.

The case of the Union Land & Stock Co. v. United States, 257 F. 635, 636 (C. C. A. 9th), was, as appears in the statement of the facts prepared by Judge Gilbert, "a suit in equity to declare forfeited a right of way and easement for the storage of water." It was alleged in the bill that the appellant, under the provisions of the act of 1891, filed in the land office at Susanville, Cal., its application for an easement for a reservoir for irrigation purposes, describing the same in the map which was attached to the application as reservoir No. 1, and which covered certain portions of the public lands of the United States, that the application was duly approved by the Secretary of the Interior, and that no part of the reservoir had been completed since the approval of said right of way by the Secretary of the Interior. The prayer of the bill was that the easement be declared forfeited and canceled.

"It was stipulated in open court that in the years 1894 and 1895 the appellant went on the ground at the point A, indicated on the map attached to the bill of complaint, and after November, 1895, constructed a dam which at that time was 35 feet high; that said dam remained at that height until the winter of 1897–98, when a portion of it was washed away; that in the fall of 1898 the dam was reconstructed to a height of 26

feet, but settled down to a height, at its lowest, of 23 feet, at which point it now remains. * * * 'It was also shown by competent evidence that the dam as constructed would not store water over more than 100 acres of the land in said reservoir, and that it did not have a capacity of more than 600 acre feet of water; that the dam was in a bad state of repair, but that it was strong enough to store water in the reservoir to a depth of 20 feet; that the base was not of sufficient width to build the dam to a height of 50 feet; and that said reservoir is one of a series of reservoirs, the others being known as dams Nos. 2 and 3, and that they are all used in connection with each other. * * * That said reservoir has been used to store water every year since its construction, with the exception of dry years, when there was no water to store.' "

Judge Gilbert, speaking for this court, said, among other things, that the grant of rights under the act of Congress of 1891 is a general one. "It opens the lands of the United States to the occupation of various and numerous applicants. By a general and permanent statute it provides the steps which they must take to acquire the rights contemplated by the grant, * * * [and] a failure to comply with the requirements of the statute of itself operated to divest the grantee of title and revest it in the government"—citing United States v. Whitney, 176 F. 593 (C. C. A. 9th).

The decree of the court declaring the easement forfeited was affirmed.

An analogous case of "substantial compliance" arises in the case of United States v. Big Horn Land & Cattle Co., 17 F.(2d) 357. 365 (C. C. A. 8th). There the map approved by the Secretary of the Interior for a reservoir for irrigation purposes called for and represented construction work which would raise the waters of a certain lake 16 feet above their natural level. The facts of the case show and the Circuit Court of Appeals concludes that the dam there in question would not raise the waters of the lake in excess of 2 feet above its natural level. In that case, as here, the lower court found that the defendant and its predecessors had partially performed their obligations to the government under the map and filings. This decree was reversed by the appellate court with the statement that they could not agree with the finding of the trial court and its decree that " 'the defendant and its predecessors in title, after they had made this application for right of way for a reservoir site and

ditch, went out there and attempted in good faith to make the construction contemplated, and did construct a dam in substantial compliance with the proposal.' Indeed, we find no evidence of any attempt to comply with the proposal after the filing of the map with the Secretary of the Interior. They may have been in good faith when they made the survey and mapped the project, but as we read the Act of March 3, 1891, faith will only avail the applicants to the extent of their works."

In that case the appellate court considered the scope and meaning of the words "any section," and stated: "We think the clear spirit and intent of the act applies to a failure to complete the reservoir as well as the canal or ditch proper; that in the particular clauses mentioned the words 'canal or ditch' were used in an inclusive sense, embracing the whole project."

The unit to be considered must be the "section," and not merely a certain part of a certain ditch or canal. The grant could not be made so that, in the case of a project involving a dam and a system of canals, the government might seize one ditch or one 10-foot section of the dam that had not been constructed. So to construe the act would mean that, in a case where a dam of a certain height had to be built to meet the needs of the surrounding community, if the dam were only half constructed, the government could seize only the uncompleted upper portion. The holder of the fee would have the lower part of the dam and the government the unconstructed upper part, but no good would flow therefrom to either of the parties involved or to the public for whose protection the law is framed. The grant is allowed in the first place as a whole, with the idea that a certain unit of work is necessary and conducive to the best interests of the public. If the grantee is allowed to do his work by halves and then to retain control over the whole project, the desire of the government is thwarted and the public generally must suffer. This is not desirable, nor does the law so read. In the instant case the unit to be considered is the dam and the reservoir that would result if the dam were built. It is not enough to say that the existing dam is a substantial improvement over conditions as they were before 1910; the question is whether or not the unit of work indicated on appellee's map of 1916 was completed, and it was the finding of the court below that the work was not done. Appellee admits that no work was done on other proposed sections of the project and that therefore they are

subject to forfeiture by the government, but we are unable to distinguish wherein his failure to carry out his obligations with respect to the construction of the ditch and the conduits differs from his failure to carry out his obligations with regard to the construction of a dam.

Appellee asserts that courts of equity generally refuse to aid in the enforcement of the penalty of forfeiture, and insists that forfeiture should be enforced in equity consonant with the principles of right and justice and in a clear case. We think that the law on this point has been clearly stated in the case of Farnsworth v. Minn. & Pac. R. Co., 92 U. S. 49, 68, 23 L. Ed. 530, as follows: "But it is said that provisions for forfeiture are regarded with disfavor and construed with strictness, and that courts of equity will lean against their enforcement. This, as a general rule, is true when applied to cases of contract, and the forfeiture relates to a matter admitting of compensation or restoration; but there can be no leaning of the court against a forfeiture which is intended to secure the construction of a work, in which the public is interested, where compensation cannot be made for the default of the party, nor where the forfeiture is imposed by positive law. 'Where any penalty or forfeiture,' says Mr. Justice Story, 'is imposed by statute upon the doing or omission of a certain act, there courts of equity will not interfere to mitigate the penalty or forfeiture, if incurred; for it would be in contravention of the direct expression of the legislative will.' Story's Eq. Jur., sec. 1326. The same doctrine is asserted in the case of Peachy v. The Duke of Somerset, reported in 1st Strange, and in that of Keating v. Sparrow, reported in 1st Ball & Beatty. In the first case, Lord Macclesfield said that 'cases of agreement and conditions of the party and of the laws are certainly to be distinguished. You can never say that the law has determined hardly; but you may that the party has made a hard bargain.' In the second case, Lord Manners, referring to this language and taking the principle from it, said that 'it is manifest, that, in cases of mere contract between parties, this court will relieve when compensation can be given; but against the provisions of a statute no relief can be given' "—cited by this court in the case of Union Land & Stock Co. v. United States, supra.

The decree of the District Court is reversed, with directions to enter a decree for appellant in accordance with the prayer of the bill.