72 U.S. 211 (____)
5 Wall. 211
UNITED STATES
v.
REPENTIGNY.
Supreme Court of United States.

*232 Mr. J.M. Howard, for the appellees, representatives of De Bonne and Repentigny.
Mr. Stanbery, Attorney-General, and Mr. Alfred Russel, District Attorney for the Eastern District of Michigan, contra.
*256 *257 Mr. Justice NELSON delivered the opinion of the court.
The bill in this case was filed in the court below to recover possession of a large tract of land of six leagues square, fronting on the River St. Marie, at the Saut, which connects the waters of Lake Superior with those of Lake Huron, in the State of Michigan. The grant of the land was made on the 18th October, 1750, by the governor and intendant-general of Canada (then called New France), to Louis De Bonne, a captain of infantry, and Count Repentigny, an ensign, in the French army. The complainants derive title under them. It was confirmed by the King of France the next year, on the 24th June, 1751.
The grant was to De Bonne and Repentigny, their heirs and assigns, "in perpetuity by title of feof and seigniory," with all the customary rights belonging to that species of estate. Repentigny went into possession about the date of the grant, at the Saut, having about the same time received an appointment to command the military post established there. He constructed a small stockade fort, and made some improvements in connection with it, such as the clearing of a few acres of land and the erection of huts for the people with him, and continued thus engaged till 1754. When war broke out between France and England he was called away into active military service of the government, and never afterwards returned. De Bonne never took personal possession, or possession of any other character, except that derived from the transient occupation of his co-tenant.
The bill was filed on the 9th January, 1861, one hundred and ten years since the date of the grant.
We will now refer to the act of Congress, passed April 19th, 1860, under which the bill was filed.
It provides that the legal representatives of the original grantees may present their petition to the District Court of the State of Michigan, setting forth the nature of their claim to certain lands at the Saut St. Marie, under an alleged grant in 1750, with evidence in support of it, and praying that the validity of the title may be inquired into, and the court is authorized to examine the same; and, in adjudicating upon *258 the validity as against the United States, to be governed by the law of nations and of the country from which the title was derived, and also by the principles, so far as they are applicable, which are recognized in the act of Congress of the 26th May, 1824. This act, which was passed to enable claimants to lands situate within the State of Missouri to try their titles before the United States District Court, directed that the claims should be heard and determined in conformity with the principles of justice, and according to the laws and ordinances of the government under which the titles originated; also, according to the law of nations and the stipulations of treaties.
This act of 1860, which authorizes the institution of these proceedings, was passed in pursuance of petitions to Congress by the representatives of the original grantees. The first notice to this government of any claim to the lands on their behalf was in the year 1825 or 1826, some seventy-five years after the date of the grant. Since then the subject has, from time to time, been brought to the attention of Congress, and finally disposed of by the passage of the act in question. The act, as we have seen, refers the claimants to the judiciary for relief, and prescribes the principles which shall govern it in hearing and adjudicating upon the case. They are 
1. The law of nations.
2. The laws of the country from which the title was derived.
3. The principles of justice.
4. The stipulations of treaties.
In the light of these principles, we shall proceed to an examination of the claim; and, first, as to the claim of the representatives of Repentigny. He was a native of Canada, and a captain in the French army at the close of the war, which terminated in the surrender of that province to the British forces, in 1760. His family was among the earliest emigrants to the country after possession had been taken by the King of France, and held high and influential positions in the government. Soon after the execution of the definitive treaty of peace of 1763, the Governor of Canada opened *259 a correspondence with Repentigny to induce him to remain in the province, and become a subject of Great Britain, promising him protection and advancement in his profession. He was then about thirty-eight years of age. But he declined all the advances made to him, and soon after left the country, by order of his superior officer, to take a command on the Island of Newfoundland, where the Indians were disturbing the settlers, and spent the rest of his life in the military service of France, having risen to the rank of Major-General and Governor of Senegal, on the Island of Goree, and its dependencies. He died in 1786, leaving a son, Gaspard, an officer in the French naval service, from whom the present claimants descended, and who reside in the Island of Guadaloupe. The preliminary treaty of the 3d November, 1762, at the surrender of Canada, provided in the second article, in behalf of his Britannic majesty, that the French inhabitants, or others who would have been subjects of the Most Christian King, in Canada, may retire in all safety and freedom, wherever they please, and may sell their estates, provided it be to his Britannic majesty's subjects, and transport their effects, as well as their persons, without being restrained in their emigration, under any pretence whatsoever, except debts or criminal prosecutions,  the term limited for this emigration being the space of eighteen months, to be computed from the day of the ratification of the definitive treaty. The definitive treaty of the 10th February of 1763 contained a similar article.
The articles of capitulation at Montreal, dated 8th September, 1760, when the Canadas were given up to the British forces, secured to the inhabitants their property movable and immovable; and the proclamation of the king, under date of 7th October, 1763, pledged to his loving subjects of Canada his paternal care for the security of the liberty and property of those who are, or should become, inhabitants thereof. These pledges, both before and after the treaty, were but the recognition of the modern usages of civilized nations which have acquired the force of law, even in the case of an absolute and unqualified conquest of the enemy's *260 country. But the rule is limited, as in the pledge of the king, in his proclamation to the inhabitants of the conquered territory, to those who remain and become the subjects or citizens of the victorious sovereign,  those who, in the language of Chief Justice Marshall, change their allegiance, and where the relations to their ancient sovereign are dissolved. Speaking of the cession of Florida, he observed: "Had Florida changed its sovereign by an act containing no stipulation respecting the property of individuals, the right of property in all those who became subjects or citizens of the new government would have been unaffected by the change."[*]
Another rule of public law, kindred to this one is, that the conqueror who has obtained permanent possession of the enemy's country has the right to forbid the departure of his new subjects or citizens from it, and, to exercise his sovereign authority over them. Hence the stipulation in the capitulation and treaties of cession providing for the emigration of those inhabitants who desire to adhere to their ancient allegiance, usually fixing a limited period within which to leave the country, and frequently extending to them the privilege, in the meantime, of selling their property, collecting their debts, and carrying with them their effects.
Now, in view of these principles, it is apparent that Repentigny, having refused to continue an inhabitant of Canada, and to become a subject of Great Britain, but, on the contrary, elected to adhere in his allegiance to his native sovereign, and to continue in his service, deprived himself of any protection or security of his property, except so far as it was secured by the treaty. That protection, as we have seen, was limited to the privilege of sale or sales to British subjects, and to carry with him his effects, at any time within eighteen months from its ratification. Whatever property was left unsold was abandoned to the conqueror. Repenigny acted upon this view of his rights. Besides the property *261 in question, he owned and possessed a seigniory situate above Montreal, on the River St. Lawrence, called La Chenay, which he sold to Colonel Christie, a British officer, and in the deed it is recited that he had a mind to go to France, and therefore, as allowed by the late treaty of peace, was disposed to sell, &c. This was in 1766, although it appears that steps had been taken in respect to the sale at an earlier day. It is evident, also, that he had been engaged in negotiating for the sale of the seigniory in question, as in a memorial of his services presented to the chief of the bureau of the French colonies, he states, under date of 1765, that the establishment,  referring to that at the Saut St. Marie,  was burnt in 1762 by the Indians, at the time his attorney was negotiating at Montreal with the English for the sale of it. And, in 1772, in a communication to the French authorities on the subject of military services and sacrifices, he observes: "I thought that after a lease of thirty years of services, fulfilled with honor in the colonies, and the sacrifice of a fortune more than reasonable, in leaving Canada, my native country, I should be able at forty-five years of age to claim a regiment in the colonies without too much ambition." And again, in answer to an intimation that the king would give him permission to retire, he observes: "If I had not calculated upon dying in the service, I should not have sacrificed more than four-fifths of my fortune, my well-being, and that of my family, in abandoning Canada, my country."
And, further, in a communication to his government, supposed to be about 1773 or 1774, he observed: "The cession of Canada, my country, has overturned a fortune more than moderate, which I could preserve only by an oath of fidelity to the new master, which was too hard for my heart. The offers of the English ministry made to my eldest brother to retain us in their service are unequivocal proofs of the consideration we enjoyed in Canada."
Repentigny was a gentleman of education and high intelligence. He rose to the rank of general in the army, and aspired to that of Marshal of France; was Governor of Senegal *262 and its dependencies, and, as is obvious from his correspondence with his government, comprehended fully the principles of public law which forfeited all his property left unsold at the time he retired from Canada, under the provisions of the treaty.
He died in 1786, twenty-three years after the date of the treaty; and, during all this time, not only set up no claim to this seigniory, but, on the contrary, repeatedly, as we have seen, urged the patriotic sacrifice of it to his government, as a merit for her favorable consideration of himself and family. And we may add that his only son, an officer in the French navy, and who died in 1808, at the age of fifty-five, also never set up any claim or right to it to this government, and the first notice she had of it, so far as the record discloses, was in 1824 or 1825, from the descendants of this son residing in the Island Guadaloupe, and who are the complainants in the suit.
We will now examine the other branch of this case,  the moiety claimed under De Bonne. He was a captain in the French service, and fell in the battle of Sillery, in 1760, under Count de Levi, in an attempt to recapture Quebec. He left a son, P.A. De Bonne, who was then only two years old. The family were inhabitants of Canada, remained after the treaty of 1763, and became subjects of Great Britain. He was of age in 1779, and, in 1781, rendered faith and homage at the Castle of St. Louis, in Quebec, before the governor, as required by one of the conditions of the grant of the seigniory, and which was accepted, and a record made of it. He became an eminent barrister in the lower province of Canada, was attorney-general, and afterwards one of the justices of the King's Bench. In 1796 he sold his interest in the seigniory to James Caldwell, of Albany, New York, a citizen of that State, and conveyed to him the title. In 1798, Caldwell quit-claimed the premises to Arthur Noble, an Irish gentleman and an alien, who resided at the time in the State of New York. He afterwards returned to Ireland, and died in 1813 or 1814, leaving a will, by which he devised all his lands in the United States to his nephew, John Slacke, *263 a barrister in the city of Dublin. Slacke devised the same, in 1819, to Agnes, his wife, with power to dispose of this and other property as she might think fit, and by sundry deeds and devises, the estate passed to John Rotton, the present claimant, and a lieutenant-colonel in the British army. All of these parties were British subjects and aliens. The territory within which the premises in question are situate, passed from France to England by the treaty of 1763, and from England to the United States by the definitive treaty of 1783, according to the boundaries there agreed upon. And assuming, for the sake of the argument, that the ninth section of the subsequent treaty of 1794 protected the interest of P.A. De Bonne in the seigniory, the question arises, whether the present claimant has established any valid title to it?
The conveyance by De Bonne to Caldwell, a citizen of the United States, passed out of him whatever title he may have had, and vested it in the grantee. It was no longer a French or English, but an American title, held under the laws of the United States, and subject to them. The transmission by deed, devise, or descent, must be according to these laws and not according to the laws of France or of England Caldwell held the lands as he held other real property, under the laws of the government within which they were situate, the same as if they had been conveyed to him by a native citizen. The intention of the parties to the treaty was, that the citizens and subjects of each should be quieted in the enjoyment of their estates, in the same manner as if they and their heirs had been native citizens and subjects. And having conveyed to Noble, who, together with those claiming under him, were aliens, the complainant is met with the objection of alienage.
It appears, however, that since 1805 laws have been passed, first, by the legislature of the Territory of Michigan, and afterwards by the State, conferring upon aliens the right to hold lands "by purchase, devise, or descent," which, it is insisted, remove the objection. Whether or not these laws apply to lands claimed by the United States as a part of the *264 public domain, is a question we shall not enter upon; as we are inclined to think, upon a liberal construction of the act of Congress under which this suit is brought, this objection may be regarded as waived.
We have thus far stated, somewhat in detail, the present state of this branch of the title,  the moiety claimed by Rotton, as derived from De Bonne. And it appears that more than a century has clapsed since the original grant; and, during all this time, there has been but some four years' actual possession or occupation by the grantee or those claiming under him, and that immediately succeeding the grant. The seigniory has been held under and subject to the laws of three governments  thirteen years under the French, twenty under the English, and seventy-seven under the United States. The first notice this government had of the title or claim was in 1824-5, forty-two years since the territory within which the lands are situate came into her possession. In the meantime her laws have been extended over it, the Indian title extinguished, the lands surveyed and put on sale, and are now, and have been for years, covered with inhabitants. As early as 1823, before this claim was presented to the government, as appears from the record, a large part of this tract was possessed and occupied by settlers, and the possession afterwards confirmed by Congress, and a military post established at the Saut for their protection and encouragement in that remote section of the country. If these grantees, their descendants or assignees had fulfilled the conditions of the grant, introduced and established tenants upon the seigniory, and thus occupied and improved the lands, they would have been among these cherished inhabitants, and their titles and possessions alike protected.
The purposes for which this grant was made, and the conditions annexed to it, are specifically stated upon its face. It recites that Repentigny and De Bonne  entertaining the purpose of establishing a seigniory  had cast their eyes upon a place called the Saut St. Marie; that a settlement in that place would be most useful for voyageurs from the *265 neighboring ports and those from the western sea, who could there find a safe retreat, and by proper precautions, which the petitioners proposed to take, would destroy in those parts the trade of Indians with the English; and (after the words of concession of six leagues in front on the river at the Saut, and six in depth) it provides that the grantees shall hold and possess the same by themselves, and cause the same to be held and possessed by their tenants, and cause all others to desert and give up the land, and "in default thereof the present concession shall be and shall remain null." In the deed of confirmation, by the king, is the following clause: "That they (the grantees) improve the said concession, and use and occupy the same by their tenants. In default thereof the same shall be reunited to his majesty's domain;" and, in a subsequent clause: "His majesty ordering that the said concession shall be subject to the conditions above expressed, without any pretext that they should not have been stipulated in the said concession."
There is a letter in the record from the Governor-General of Canada, under date of October 5, 1771, to the government at Paris, giving the reasons for this concession. He writes: "I had the honor to let you know (by a former letter) that in order to thwart the movements that the English do not cease to make to seduce the Indian nations of the North, I had sent Sr. Chevalier Repentigny to the Saut of St. Marie, to make there an establishment at his own expense, and to build a palisade fort to stop the Indians of the northern posts, who go to and from the English, to intercept the commerce they carry on, and to stop and prevent the talks, and also the presents which the English send these nations to corrupt them and get them in their interests. Moreover, I had in view in that establishment to secure a retreat to the French voyageurs, especially those who trade in the northern parts, and for the purpose to clear the lands which are proper for the production of Indian corn, and to sustain thereby the victualling the people of the said post, and even to the needs of the voyageurs."
*266 And in a letter, by the minister at Paris, to a high official in Canada, he alludes to that of the governor above referred to, and observes, "In one of my despatches last year to the governor, I had intimated to him that I had approved the construction of a fort at the Saut of St. Marie, and the project of cultivating the land there, and raising cattle. We cannot but approve the dispositions which have been made for the execution of that establishment, but it must be considered that the cultivation of the lands, and the multiplication of cattle must be the principal object, and that trade must be only accessory. As it can hardly be expected, he observes, that any other grain than corn will grow there, it is necessary, at least for a while, to stick to it, and not to persevere stubbornly in trying to raise wheat."
The purposes and conditions of the grant are too obvious to require further comment.
It is admitted by the learned and intelligent jurists of Canada, who have been examined as witnesses in this case, that the legal liabilities to seignioral reunion to the royal domain exists in cases of the non-fulfilment of the conditions of settlement, and which is rigorously enforced if there be no cleared lands and no settlers on the seigniory. That the right to resume the grant applies only to unimproved seigniories, to all those that have been neglected, as it respects the establishment of tenants upon the lands, and the consequent absence of cultivation, such as clearing the forests, converting them into fruitful fields, laying out and working public roads, building mills for the convenience of the tenants, and the like.
We agree to this interpretation of the conditions. We cannot, however, assent to the next position taken, namely, that the possession and improvement of Repentigny, during the four years that he occupied the seigniory at the Saut, should be regarded as a fulfilment of this condition. It contained over two hundred thousand acres of land, and the whole of the improvements claimed in his behalf, besides the stockade fort, consisted in the erection of three or four temporary huts for laborers, the clearing of a few acres of land *267 around the fort, and planting the same with Indian corn. His stock consisted of seven head of cattle and two horses, and, since 1754, over a century before the commencement of this suit, there has been no possession or occupancy by either of the grantees, or their descendants, tenants, or assigns, or further trace of improvements. The primeval forest remained unbroken till settlers entered upon it and established themselves under the protection of the laws, and regulations in pursuance thereof, of the United States.
It is argued, however, that according to the customs and usages of France in respect to these conditions of settlement, that no reunion to the royal domain could be asserted except by a judicial determination; that the king was disabled by his own ordinances from decreeing a reunion. We think, upon the proofs in the record, this may well be doubted, in the case of such prolonged neglect to conform to the conditions of settlement, as in the instance before us. It furnishes cogent, if not, irresistible evidence of the abandonment of the duties and obligations arising out of the conditions of the grant, and consequently of the grant itself; and invites a direct resumption by the sovereign, the lord paramount. Assuming De Bonne's title to have been valid under the treaty of 1794, thirty-one years elapsed before this government had any notice of its existence, and in the meantime neither De Bonne nor those claiming under him had taken any steps in fulfilment of the conditions. They could at least have applied to the government for the privilege of fulfilling the conditions, or to obtain a remission of them.
But we do not intend to put this branch of the case on this ground. The United States succeeded to all the rights to this territory that existed in the King of France, under the treaty of 1783, with Great Britain, at the close of the Revolution. The United States then became the lord paramount of this seigniory, and were thereby invested with the power to deal with the seigniorial estate, the same as the King of France, had it continued under his dominion; and we agree that before a forfeiture or reunion with the public domain could take place, a judicial inquiry should be instituted, or, *268 in the technical language of the common law, office found, or its legal equivalent. A legislative act, directing the possession and appropriation of the land, is equivalent to office found. The mode of asserting or of assuming the forfeited grant, is subject to the legislative authority of the government. It may be after judicial investigation, or by taking possession directly, under the authority of the government, without these preliminary proceedings.[*] In the present instance we have seen the laws have been extended over this tract, the lands surveyed, and put on sale, and confirmed to the occupants or purchasers, and, in the meantime, an opportunity given to all settlers and claimants to come in before a board of commissioners and exhibit their claims. This is a legislative equivalent for the reunion by office found.
Upon the whole we are quite satisfied that, consistent with the principles, in the light of which we are directed by the act of Congress to examine into the validity of this title, the complainants have failed to establish it. We have felt justified in applying to the case these principles with reasonable strictness and particularity, as it is nearly, if not wholly, destitute of merit.
Decree of the court below reversed, and case remanded with directions to
DISMISS THE BILL.
NOTES
[*] United States v. Percheman, 7 Peters, 51-87.
[*] Fairfax v. Hunter, 7 Cranch, 603, 622, 631; Smith v. Maryland, 6 Id. 286