## McMicken *v.* United States.

1. On Dec. 17, 1798, A. applied to the Spanish governor-general for a grant of six hundred and ten arpents of land, for a plantation and settlement, in the district of Baton Rouge, three miles from the Mississippi. To the application was annexed a certificate of the local surveyor that in the district of St. Helena, on the west bank of the Tangipahoa River, beginning at the thirty-first parallel of latitude, the boundary line of the United States, and about fifty miles east of the Mississippi, there were vacant lands in which could be found the arpents front which the petitioner asked for, excluding whatever might be in the possession of actual settlers. To this application the surveyor of the district added a further certificate, dated Dec. 22, 1798, and addressed to the governor, by which he stated that four hundred and ten arpents might be conceded in the place indicated by the local surveyor. Thereupon De Lemos, then governor, issued a warrant or order of survey, as follows:—

"New Orleans, Jan. 2, 1799.

"The surveyor of this province, Don Carlos Trudeau, shall locate this interested party on four hundred and ten arpents of land, front, in the place indicated in the foregoing certificate, they being vacant, and thereby not causing injury to any one, with the express condition to make the high-road and do the usual clearing of timber in the absolutely fixed limit in one year; and that this concession is to remain null and void if at the expiration of the precise space of three years the land shall not be found settled upon, and to not be able to alienate it within the same three years, under which supposition there shall be carried out uninterruptedly the proceedings of the survey, which he (the surveyor) shall transmit to me, so as to provide the interested party with the corresponding title-papers in due form."

Neither survey, settlement, nor improvement of any kind was ever made by A., or by any one claiming under him. On Feb. 26, 1806, after the cession of Louisiana to the United States, but before this part of it was surrendered by Spain, he procured from the local Spanish surveyor at Baton Rouge an authority to a deputy surveyor, to survey the tract according to certain general instructions which do not appear, specifying, however, that it was understood that the warrant was for a certain number of arpents in front, and that the depth ought to be forty arpents, or four hundred perches of Paris. Nothing was ever done by the deputy surveyor, and the prosecution of the grant was abandoned by A. and his assigns until long afterwards. Grandpré having, in 1806, become governor, issued a warrant for a thousand arpents, on a portion of the tract, to one Yarr, whose title was subsequently confirmed by the United States. Before the country was occupied by the United States, actual settlers had become possessed of the whole tract, and they were, upon the report of the commission appointed to investigate the titles to land in that region, subsequently confirmed in their holdings by the act of March 3, 1819. A., Sept. 16, 1814, assigned his right to the land to B., who, Dec. 26, 1824, presented his claim to the lands to the commissioners, under the act passed May 26, 1824 (4 Stat. 59), by whom it was rejected. B. having died, C., claiming as his devisee, brought this suit under the act of June 22, 1860, entitled "An Act for the final adjust-

ment of land-claims in the States of Florida, Louisiana, and Missouri, and for other purposes " (12 id. 85), but showed no derivation of title to himself. *Held*, 1. That the lands, by reason of the non-performance within the specified time of the conditions mentioned in the warrant of survey, were forfeited and became subject to the disposing power of the United States. 2. That, if the legal representatives of B. had a valid claim, C., being a stranger thereto, and showing no interest therein, would not be entitled to a decree confirming it in their favor.

2. The said act of June 22, 1860 (*supra*), although it contains sundry remedial provisions, and removes the objection arising from the want of title in the government which was in possession of the territory at the time of making the grants, if they were otherwise sustainable on the principles of justice and equity, does not aid claims which from intrinsic defects were invalid in 1815 or 1825.

3. The laws and the proceedings thereunder, touching French and Spanish grants, mentioned, and the decisions as to the effect thereon of a breach of the conditions annexed thereto cited and examined.

APPEAL from the District Court of the United States for the District of Louisiana.

The facts are stated in the opinion of the court.

*Mr. Willis Drummond* and *Mr. Robert H. Bradford* for the appellant.

*The Solicitor-General, contra.*

MR. JUSTICE BRADLEY delivered the opinion of the court.

The claim to lands in this case originated as follows: On the 17th of December, 1798, William Coleman, an inhabitant of New Feliciana, within the bounds of the present State of Louisiana, east of the Mississippi River, applied to the Spanish governor-general for a grant of six hundred and ten arpents of land, for a plantation and settlement, in the district of Baton Rouge, three miles from the Mississippi. A certificate of the local surveyor was annexed to the application, certifying that there were vacant lands in the district of St. Helena, on the west bank of the Tangipahoa River, beginning at the thirty-first parallel of latitude (the boundary line of the United States), in which could be found the arpents front which the petitioner asked for, excluding whatever might be in the possession of actual settlers. The place thus indicated was about fifty miles east of the Mississippi. To this application Grandpré, the surveyor of the district, added a further certificate, dated Dec.

22, 1798, and addressed to the governor, by which he stated that four hundred and ten arpents might be conceded in the place indicated by the local surveyor. Thereupon the governor, De Lemos, on the 2d of January, 1799, issued a warrant or order of survey, in the following terms (as translated):—

"New Orleans, Jan. 2, 1799.

"The surveyor of this province, Don Carlos Trudeau, shall locate this interested party on four hundred and ten arpents of land, front, in the place indicated in the foregoing certificate, they being vacant, and thereby not causing injury to any one, with the express condition to make the high-road and do the usual clearing of timber in the absolutely fixed limit in one year; and that this concession is to remain null and void if at the expiration of the precise space of three years the land shall not be found settled upon, and to not be able to alienate it within the same three years, under which supposition there shall be carried out uninterruptedly the proceedings of the survey, which he (the surveyor) shall transmit to me, so as to provide the interested party with the corresponding title-papers in due form.

(Signed)          "Manuel Gayoso de Lemos."

This is the only title presented, and neither survey nor settlement, nor improvement of any kind, appears ever to have been made on the part of the petitioner or any one claiming under him. The only thing done by him in that direction was to procure from Pintado, the local Spanish surveyor at Baton Rouge, on the 26th of February, 1806, after the country had been ceded to the United States, but before this part had been surrendered by Spain, an authority to one Ira C. Kneeland, a deputy surveyor, to survey the tract according to certain general instructions (which do not appear), specifying, however, that it was understood that the warrant was for a certain number of arpents in front, and that the depth ought to be forty arpents, or four hundred perches of Paris; which would make the tract contain sixteen thousand four hundred arpents, the quantity now sought to be recovered of the United States. But nothing was ever done by Kneeland, and the prosecution of the grant seems to have been abandoned by Coleman and his assigns until long afterwards. Grandpré himself, in 1806 (hav-

ing become governor), issued a warrant for a thousand arpents, on a portion of the tract, to one Robert Yarr, who entered upon and settled the same; and his title was subsequently confirmed by the United States. And before the country was occupied by our government, actual settlers had become possessed of the whole tract, who were subsequently confirmed in their holdings by the act of March 3, 1819, upon the report of the commissioners who had been appointed to investigate the title to lands in that region. Most of the claims of these settlers were presented to Commissioner Cosby in 1812, 1813, and 1814, he being then engaged in ascertaining all claims to lands in the district west of Pearl River. His report was made in the early part of 1815 (Amer. State Papers, Public Lands, vol. iii. pp. 39–76); but no claim seems to have been presented by Coleman for the lands in question.

On the 16th of September, 1814, he assigned his right to the land to one Charles McMicken, under whom the appellant claims as devisee. But neither did McMicken present any claim to the commissioner.

Under the various laws extending the time for presenting claims several other reports were subsequently made by the commissioners for the St. Helena district west of Pearl River; and finally, under an act passed May 26, 1824 (4 Stat. 59), additional claims were received in that year, and a report was made in the January following, in which the claim in question first comes to notice. The petition in this case states that it was presented to the commissioners on the 26th of December, 1824. With various others, it was rejected by them on the ground that " the claimants had not complied with the requisitions of the law as regards either habitation or cultivation." Amer. State Papers, Public Lands, vol. iv. pp. 438, 443. This report was confirmed by Congress by the act of May 4, 1826. 4 Stat. 159. In 1846, McMicken instituted suit in the United States District Court of Louisiana, against the United States, under the provisions of the act of June 17, 1844, for the confirmation of the grant; but this suit was not prosecuted when called up for trial, and was dismissed, and judgment entered for the United States. In March, 1873, the present suit was brought under the act of June 22, 1860, entitled " An Act for the final

adjustment of private land-claims in the States of Florida, Louisiana, and Missouri, and for other purposes." 12 id. 85. A decree was rendered in favor of the United States. McMicken thereupon appealed to this court.

Two questions arise in the case: *first,* whether the petitioner has shown any derivation of title to himself; and, *secondly,* whether the claim is a valid one.

The petitioner claims as devisee of Charles McMicken, under his will, bearing date in 1855, which is set out in full in the record. An inspection of this will shows that the tract in question was not named in it, nor devised in any way. It mentions various other tracts in Louisiana belonging to the testator, but not this one. It would seem that McMicken had abandoned all idea of establishing the validity of the claim. As the appellant does not pretend to have any other title than that of devisee under this will, it is difficult to see how his petition can be sustained. If this were an action of ejectment, there could be no question on the subject. But it is contended on the part of the petitioner that whether his own title be properly deraigned or not, the court, if satisfied of the validity of McMicken's title, might make a decree in favor of his legal representatives, for the benefit of whom it might concern. A decree in this form is often made against the government in these land cases, when a title is satisfactorily established, and the parties prosecuting it connect themselves in some way with it, so as to show some real interest to be protected. *Castro* v. *Hendricks,* 23 How. 438; *Brown* v. *Brackett,* 21 Wall. 387. But a mere stranger to the title can hardly ask the court to go that length. It is not for every one who chooses to take up the prosecution of such claims, without any connection whatever with the title sought to be established.

But the more important question in this case is that relating to the validity of McMicken's title to the land.

We do not understand that the act of 1860 was intended to make any claims valid which would not have been, so before, if the government making the grant had had the right to make it. The objection of want of title in the granting power was removed by the act, as to all grants made by a government in possession which were otherwise sustainable on the principles of

justice and equity; the time for presenting claims was opened and extended; and actual surveys were dispensed with where the land could be otherwise identified. These were the principal remedial provisions of the act so far as relates to the validity of titles. Claims invalid from intrinsic defects in 1815 or 1825 are not helped by the act of 1860. The utmost that our treaty stipulations ever required was, that we should sustain titles which would have been sustained by the government from which our title to the territory was derived. Nothing more could be fairly asked, and we think that nothing more was intended by Congress to be given, except to make provision (as it did from time to time) in favor of actual settlers.

The question then arises, whether the decision of the commissioners in 1824, with regard to this claim, was not correct. The title was nothing but a warrant or permit to survey, occupy, and improve the land, with a view to a grant when this should be done, and with an express condition to be void if not done within three years. Such warrants or permits have invariably been respected by our government, whenever there has appeared any *bona fide* attempt to perform the conditions, or any plausible excuse for their non-performance. But where no such attempt has been made, and no excuse is offered for not making it, the claim has been disallowed. Under such circumstances it would be simply asking the government for a gratuity, a donation without the slightest consideration, to seek a grant of the land. The government does not stand upon formal conditions. It does not demand that there should have been an actual survey, if the land can be otherwise identified. The act of 1860 expressly gives relief not only in case of " orders of survey duly executed," but where there has been " any other mode of investiture of title, by separation of the land from the mass of the public domain, either by actual survey, or definition of fixed natural and ascertainable boundaries, or initial points, courses, and distances, by the competent authority prior to the cession to the United States." The present case may perhaps come within this category. The description in the warrant, aided by the usages of the Spanish government with regard to surveys in Louisiana, may admit of definite identification on

the ground both as to location and quantity. But the main defect still remains, — the absence of any attempt at settlement and cultivation. These conditions have always been regarded as material by the various commissioners appointed to investigate these titles, and their decisions on the subject have been uniformly confirmed by Congress. They seem to be in accord with the laws and usages of the Spanish government; which laws and usages, from the first, were adopted as the proper criterion for determining the validity of titles emanating from that government.

These propositions will be corroborated by a reference to the laws which have been passed and the proceedings which have been taken in relation to French and Spanish titles in Louisiana.

That province was acquired by the treaty with France of April 30, 1803. Spain had ceded it to France by the treaty of St. Ildefonso, on the 1st of October, 1800; but did not deliver possession of it until after it was ceded to the United States. That portion of the territory west of the Mississippi, including New Orleans, was surrendered to our government on the 20th of December, 1803; but Spain retained possession of the remainder, east of the Mississippi, for several years longer, under the pretence that it belonged to West Florida, and made many grants of land in that time. The United States did not acquire entire possession of the country till 1813, though portions of it were occupied in 1810. Amer. State Papers, For. Relations, vol. ii. pp. 582, 575; vol. iii. p. 397; and Act of Congress, Feb. 12, 1813, 3 Stat. 472. The treaty with France required that the inhabitants should be protected in their liberty, property, and religion. In carrying out this stipulation the United States repudiated the grants of land made by the Spanish government subsequent to the treaty of St. Ildefonso, except when made in accordance with the known laws, usages, and customs of that government; which laws, usages, and customs had special reference to the colonization and settlement of the lands, and not to a sale of them for the purposes of revenue or speculation. Whilst repudiating the grants referred to, as of no binding obligation upon the United States, a liberal policy was adopted towards the grantees wherever they had actually set-

tled upon and cultivated their lands, and had thus in good faith complied, or attempted to comply, with the conditions upon which they were made. In carrying out this policy, it will be seen that all imperfect titles, such as orders of survey, permissions to settle, and the like, which had annexed to them the condition of settlement and cultivation of the lands as a prerequisite to a complete title, were rejected, if no attempt was made by the claimants to perform those conditions.

By the act of March 26, 1804, by which the ceded territory was organized into the territories of Orleans and Louisiana, whilst it was expressly declared that all grants made by the Spanish government, and all proceedings looking to a grant, made or taken after Oct. 1, 1800, should be deemed absolutely void, a provision was inserted for the confirmation, to the extent of one square mile, of all regular grants made to actual settlers, and of all *bona fide* acts and proceedings done by them to obtain grants, if the settlements were actually made prior to Dec. 20, 1803.

By the act of March 2, 1805, actual settlers who had only incomplete titles from the French and Spanish governments, issued prior to Oct. 1, 1800, and who actually inhabited and cultivated their lands on that day, were confirmed in their titles thereto, provided that they were heads of families or of age, and had fulfilled the conditions and terms on which the completion of the grants was made to depend. The act went further, and declared that all who, prior to Dec. 20, 1803, with the permission of the proper Spanish officers, and in conformity with the laws and usages of the Spanish government, had made an actual settlement of any tract, and did then actually inhabit and cultivate the same, should have such lands to the extent of one mile square to each person, with the customary addition for a wife and family. By the act of April 21, 1806, permission to settle was to be presumed, if the party had commenced an actual settlement prior to Oct. 1, 1800, and had continued actually to inhabit and cultivate the land for three years prior to Dec. 20, 1803.

The act of March 23, 1807, further provided that any person who, on the 20th of December, 1803, had for ten consecutive years been in possession of a tract of land not exceeding two

thousand acres, and not claimed by others, and was on that day resident in the territory, and had still possession, should be confirmed in his title thereto.  The fourth section of this act gave the commissioners appointed, or to be appointed, for the purpose of ascertaining the rights of persons claiming land in the territory full power to decide, according to the laws and established usages and customs of the French and Spanish governments, upon all claims to lands in their respective districts, when made by those who were inhabitants of Louisiana on the 20th of December, 1803, and for a tract not exceeding one league square. By the eighth section they were to arrange the claims presented to them in three classes, showing: *first*, claims which, in their opinion, ought to be confirmed in conformity with the provisions of previous acts; *secondly*, claims which, though not embraced by those provisions, ought nevertheless, in the opinion of the commissioners, to be confirmed in conformity with the laws, usages, and customs of the Spanish government; *thirdly*, claims which neither were embraced in the provisions of previous acts, nor ought, in the opinion of the commissioners, to be confirmed in conformity with the laws, usages, and customs of the Spanish government.

By the act of April 25, 1812, that part of the ceded territory lying between the Mississippi and Perdido Rivers was divided into two land districts, one on the east, the other on the west side of Pearl River; and all persons claiming lands by virtue of grant, order of survey, or other evidence of claim derived from the French, British, or Spanish governments were required to deliver the same to the commissioner of the proper district, to be examined and recorded.  By the fifth section of this act the said commissioners were empowered to inquire into the justice and validity of the claims presented, and to this end to ascertain in each case whether the lands claimed had been inhabited and cultivated; when surveyed, and by whom and what authority; and into every other matter respecting the claims which might affect the justice and validity thereof: and all evidence thus obtained was to be recorded.  These claims they were to arrange into classes, and report them to the Secretary of the Treasury; and they were also to report a list of all actual settlers on the lands not having any claims derived from

prior governments, and the time when the settlements were made.

In pursuance of this act, and others in continuation of it, reports were made from time to time by commissioners appointed for the purpose. The first report from the St. Helena district, on the west of the Pearl River (where the lands in question are situated), was made in 1815. Amer. State Papers, Public Lands, vol. iii. pp. 39–76. Others were made Dec. 24, 1819, Nov. 18, 1820, July 24, 1821, Jan. 19, 1825, and Dec. 8, 1825. Id., vol. iii. pp. 436, 465, 505; vol. iv. pp. 538, 473. These reports presented classified lists or registers of the claims presented, as required by the act. In the report for 1815, for example, Register A exhibited a list of claims founded on complete grants derived from either the French, British, or Spanish governments, which, in the opinion of the commissioner, were valid agreeably to the laws, usages, or customs of such governments. This list embraced not only grants made before Oct. 1, 1800, but also grants made after that date whilst Spain continued in possession of the country. But the latter were either based on an order of survey made prior to Oct. 1, 1800, or were followed up by inhabitation and cultivation according to the laws and usages of the Spanish government. Register B exhibited a list of claims founded on incomplete titles only, such as orders of survey, permits to settle, &c., derived from either the French, British, or Spanish authorities, which, in the opinion of the commissioner, ought to be confirmed. The majority of these claims, the commissioner says, were originated by the Spanish authorities prior to the purchase of Louisiana by the United States, and, agreeably to the laws, usages, and customs of the then existing government, would have been completed by the same power which granted them. Some were issued subsequently to the purchase. In relation to these, the decision in their favor was not predicated upon the validity of the orders of survey, but simply upon the fact that the parties had occupied and cultivated their lands, and had complied with all the requisitions of the government which at that time exercised ownership over the soil. Amer. State Papers, Public Lands, vol. iii. p. 66. Registers C and D contained a list of grants and orders of survey made after the cession to the United States, and not

in the regular way, according to the laws and usages of the Spanish government, and, generally, not followed by any habitancy or cultivation of the lands. These grants and orders of survey were mostly of a speculative character, many of them being for large tracts, obtained at a few cents per acre, and evidently made for the purpose of getting as much as possible out of the precarious and disputed title by which the Spanish government still held possession of the country. The reports also contained a list of actual settlers upon the lands, who had no written title to show.

This report, with some qualifications, was confirmed by the act of March 3, 1819. 3 Stat. 528. The claims founded on complete grants, and contained in Register A, were all confirmed. As to those founded on orders of survey, permission to settle, &c., which the commissioners reported in favor of, the act confirmed such of them as were derived from the Spanish government prior to the 20th of December, 1803, and when the land was claimed to have been cultivated and inhabited on or before that day; and as to the remainder, declared that the claimants should be entitled to grants by way of donation, not to exceed twelve hundred and eighty acres to any one person. The act also made a donation of six hundred and forty acres to each actual settler who had no written title. This provision included most of the persons who had settled on the tract in question in this case.

Subsequent reports and confirmations were made; but the above is a fair sample of all, and evinces the principles upon which the government proceeded in confirming titles derived from the French and Spanish governments. They are cited for the purpose of showing, and we think they conclusively show, the fact that the government of the United States has always regarded the condition of inhabitancy and cultivation, annexed to imperfect titles derived from the Spanish government in the Louisiana territory, as material and essential, and as having this character by the laws and usages of that government.

We might have rested for the conclusion thus reached upon a line of cases decided by this court, and concisely summed up by Mr. Chief Justice Taney, in the able opinion delivered by

him in the case of *Fremont* v. *United States*, 17 How. 553–556. But as it seems to be thought that every semblance of title or concession, however stale, and without regard to conditions of whatever kind, has been revived and validated by the act of 1860, we have preferred to review the original grounds upon which the policy of the United States government, with regard to these Spanish and other grants, was based, and to show what that policy really was.   Mr. Chief Justice Taney, speaking of these incomplete titles in Louisiana and Florida, with very accurate knowledge of the subject, says: " These grants were almost uniformly made upon condition of settlement, or some other improvement, by which the interest of the colony, it was supposed, would be promoted.   But until the survey was made no interest, legal or equitable, passed in the land.   The colonial concession granted on his petition was a naked authority or permission, and nothing more.   But when he had incurred the expense and trouble of the survey, under the assurances contained in the concession, he had a just and equitable claim to the land thus marked out by lines, subject to the conditions upon which he had originally asked for the grant.   But the examination of the surveyor, the actual survey, and the return of the plat were conditions precedent, and he had no equity against the government, and no just claim to a grant until they were performed; for he had paid nothing, and done nothing, which gave him a claim upon the conscience and good faith of the government."

We have been referred to some cases decided by this court which are supposed to treat the conditions contained in these titles as of no importance, and as not necessary to be performed.   But it will be found that these cases relate to perfected grants, or that they are otherwise distinguishable from cases like that now under consideration.

The first is *Chouteau's Heirs* v. *United States*, 9 Pet. 147. The condition in that case related to the number of cattle which the grantee ought to have, according to Governor O'Reilly's regulations, in order to be entitled to the lands claimed by him.   The grant had, in fact, been made; and the court rightly held that this was a preliminary condition, and that the fact that the applicant possessed the requisite amount

of property to entitle him to the land he solicited was submitted to the officer who decided on the application, and that he was not bound to prove it to the court which passed on the validity of the grant.

The next case is *United States* v. *Aredondo and Others* (6 id. 691), in which there was a complete grant of title, with a condition subsequent that the grantee should establish on the lands granted two hundred Spanish families, and begin the establishment within three years, no time being fixed for its completion. It was begun in the prescribed time, but its completion was prevented by the change of government. The court held that, in equity, the doctrine of *cy pres* would be applied to relieve the grantees from that strict performance which a court of law would require. The performance was held to have become impossible by the act of the grantor.

The next case is *United States* v. *Sibbald*, 10 id. 313. A concession had been made by the governor of East Florida of a right to build a saw-mill, and of sixteen thousand acres of land to supply the same with timber, with a condition that the grant for the land should not take effect until the mill was erected. The land was duly surveyed, and various attempts were made to complete the mill, which were frustrated by floods and other accidents. It was not completed until 1827, some time after the United States had acquired possession of the country. The court sustained the grant, holding that there was no time limited for erecting the mill, that it was completed in sufficient time, and that, in equity, it would have been sufficient to show a performance *cy pres*. Doubts were, indeed, expressed whether the court was authorized to give effect to a condition of forfeiture where the land had been legally granted; but that point was not necessarily involved in the case.

*Hornsby* v. *United States*, a California case (10 Wall. 224), is also referred to. There a decree for a concession had been duly made, with direction for a grant to issue, and the formal grant had issued accordingly, containing the usual conditions, that the grant should be approved by the departmental assembly, and that the grantees should solicit the proper judge to

give them judicial possession, marking the boundaries with proper land-marks, &c. The quantity granted was nine square leagues of the surplus of a certain ranche, after satisfying two former grants. Judicial possession had not been obtained when the United States took possession of the territory, which happened about sixty days after the grant had been made. This was held a sufficient excuse for not complying with that condition. The opinion says: " The court cannot inquire into any acts or omissions by them [the grantees] since those authorities [the Mexican authorities] were displaced. It is not authorized to pronounce a forfeiture for any thing done or any thing omitted by them since that period." p. 239. As to the condition of obtaining the confirmation of the departmental assembly, it was held that this was the duty of the governor, and not of the grantee; and that as the conditions were all conditions subsequent, the estate could not be defeated by the governor's neglect. It was further held that the grant, in that case, being a full and perfect grant for so many leagues in a certain locality, to be surveyed by the officers of the government, could not fail for want of the survey being actually made: that mere neglect to comply with the conditions did not work a forfeiture, which could only be set up after a denouncement, or some other formal act indicating an intention on the part of the sovereign to resume proprietorship of the land.

There is nothing in any of these cases inconsistent with the assertion of the forfeiture in the case before us. Here no title was granted: nothing but a permit to inhabit and cultivate as preliminary to a grant. It might have ripened into an equitable title had the conditions been fulfilled, or even if a fair effort had been made to fulfil them, or if any plausible excuse could be offered for their non-fulfilment. But no attempt even appears ever to have been made to fulfil them; and the government proceeded to make other dispositions of the land. There is no need of any more formal assertion by the government of its right to resume the proprietorship. This court has in several cases maintained the doctrine that an actual entry or office found is not necessary to enable the government to take advantage of a condition broken, and to resume the possession

of lands which have become forfeited. It was so held in *United States* v. *Repentigny's Heirs,* 5 Wall. 211; *Schulenberg* v. *Harriman,* 21 id. 44; and *Farnsworth* v. *Minnesota & Pacific Railroad Co.,* 92 U. S. 49. In *Repentigny's Case* the court says: "The mode of asserting or assuming the forfeited grant is subject to the legislative authority of the government. It may be after judicial investigation, or by taking possession directly, under the authority of the government, without these preliminary proceedings. In the present instance, we have seen the laws have been extended over this tract, the lands surveyed and put on sale, and confirmed to the occupants or purchasers, and, in the mean time, an opportunity given to all settlers and claimants to come in before a board of commissioners and exhibit their claims. This is a legislative equivalent for the reunion by office found." The same doctrine was applied, in the case of *Farnsworth,* in relation to a grant of lands and privileges for the construction of a railroad.

In the case before us, if any act of the government was necessary to indicate a resumption of the grant for a non-compliance with its essential conditions, nearly all the volumes of the Statutes at Large, and of the State Papers relating to public lands for a period of twenty years, could be cited to show it.

We think that the claim was properly rejected, both by the commissioners in 1825, and by the court below, and that there is nothing in the act of 1860 which can be justly relied on for sustaining it.

*Decree affirmed.*