## ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY *v.* McGEE.

IN ERROR TO THE SUPREME COURT OF THE STATE OF MISSOURI.

Argued November 11, 1885.—Decided November 23, 1885.

In order that an act of Congress should work a reversion to the United States for condition broken of lands granted by them to a State to aid in internal improvements, the legislation must directly, positively, and with freedom from all doubt or ambiguity manifest the intention of Congress to reassert title and resume possession.

No such intention is manifested in the act of July 28, 1866, 14 Stat. 338, so far as it affects the lands granted to the States of Arkansas and Missouri by the act of February 9, 1853, 10 Stat. 155, except as to mineral lands.

The facts are stated in the opinion of the court.

*Mr. A. B. Browne* [*Mr. A. T. Britton* and *Mr. Thomas J. Portis* were with him on the brief] for plaintiff in error.

No appearance for defendant in error.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

This was an action of ejectment brought by the St Louis, Iron Mountain and Southern Railway Company against Hugh McGee, to recover the possession of the N. $\frac{1}{2}$ of N. E. $\frac{1}{4}$ sec. 17,

T. 26, R. 11, in Stoddard County, Missouri. The Supreme Court of Missouri rendered judgment in favor of McGee. To reverse that judgment this writ of error was brought. The facts are these:

On the 9th of February, 1853, Congress passed an act granting certain lands to the States of Arkansas and Missouri to aid in building a railroad from a point on the Mississippi opposite the mouth of the Ohio, by way of Little Rock, to the Texas boundary line near Fulton. 10 Stat. 155. Sections 4 and 5 of that act are as follows:

"SEC. 4. That the said lands hereby granted to the said States shall be subject to the disposal of the Legislatures thereof, for the purposes aforesaid and no other; and the said railroad and branches shall be and remain a public highway for the use of the government of the United States, free from toll or other charge upon the transportation of any property or troops of the United States.

"SEC. 5. That the lands hereby granted to said States shall be disposed of by said States only in the manner following; that is to say, that a quantity of land not exceeding one hundred and twenty sections, and included within a continuous length of twenty miles of said road, may be sold; and when the Governors of said State or States shall certify to the Secretary of the Interior that twenty continuous miles of said road is completed, then another like quantity of land hereby granted may be sold; and so from time to time until said road is completed; and if said road is not completed within ten years, no further sales shall be made, and the land unsold shall revert to the United States."

The land in dispute is within the limits of this grant.

The Cairo and Fulton Railroad of Missouri was incorporated as a railroad company under the laws of Missouri, January 12, 1854, and on the 20th of February, 1855, the legislature of Missouri passed an act vesting in that company full and complete title to the lands granted to the State by the act of 1853, so far as the same were applicable to the building of the road from the northern boundary of Arkansas to the Mississippi, opposite the mouth of the Ohio. This grant by Missouri was

made " for the uses and purposes, and subject to the condition, reversion and provision set forth and contained in said act of Congress and of this act."    Section 5 is as follows::

" For the purpose of raising funds from time to time, for the construction of the said railroad, the said company may sell the said lands, in the manner provided for by the said act of Congress, and may issue their bonds in such sums as they may deem proper, at rates of interest not exceeding seven per cent. per annum, payable semi-annually, and the principal of said bonds payable at such time and place as they may designate; and may secure the payment of said bonds by mortgage of said lands, or any part thereof, to be executed by said company, and may make the said bonds convertible into land or stock of the company within such periods as they may prescribe: *Provided*, that the faith of the State is in no manner pledged for the redemption of said bonds, or any part thereof: *And provided further*, that nothing in this act contained shall be construed to authorize said company to sell, dispose of, or apply the said lands, or the proceeds thereof, in any other manner, or to any other purpose, than as required and limited by the said act of Congress."    Laws of Missouri, 1855, 314.

On the 3d of January, 1859, the company sold and conveyed the land sued for to McGee, who immediately went into possession, and has ever since occupied and improved it as his own, and paid the taxes and assessments thereon.    This deed was duly recorded January 10, 1859.    The land is more than forty miles from the starting point of the road on the Mississippi, and it does not appear that when it was sold a sufficient number of miles of the road had been built to authorize its sale.

On the 19th of February, 1866, the legislature of Missouri directed the governor of the State to sell at auction the Cairo and Fulton Railroad of Missouri, so far as the same was " constructed or projected, together with their appurtenances, rolling-stock, and property of every description, and all rights and franchises thereto belonging," " in pursuance of the provisions of the several acts creating a lien on said railroads, their appurtenances, rights, and franchises, in favor of the State."    Laws of Missouri 1865–1866, 107.

On the 28th of July, 1866, Congress, 14 Stat. 338, ch. 300, enacted that the original act of February 9, 1853, granting lands to the States of Arkansas and Missouri, " with all the provisions therein made, be, and the same is hereby, revived and extended for the term of ten years from the passage of this act; and all the lands therein granted, which reverted to the United States under the provisions of said act, be, and the same are hereby, restored to the same custody, control, and condition, and made subject to the uses and trusts in all respects as they were before and at the time such reversion took effect: *Provided*, that all mineral lands within the limits of this grant and the grant made in section two of this act, are hereby reserved to the United States: *And provided further*, that all property and troops of the United States shall at all times be transported over said railroad and branches, at the cost, charge, and expense of the company or corporation owning or operating said road and branches respectively, when so required by the government of the United States."

By § 2 of the same act an additional grant of lands was made, " subject to the same uses and trusts, and under the same custody, control, and conditions, and to be held and disposed of in the same manner as if included in the original grant." It was then provided " that the lands embraced in this grant and the grant revived by section one of this act shall be disposed of only as follows: Whenever proof shall be furnished, satisfactory to the Secretary of the Interior, that any section of ten consecutive miles of said road . . . is completed in a good, substantial, and workmanlike manner as a first-class railroad, the Secretary of the Interior shall issue patents for all the lands granted as aforesaid, not exceeding ten sections per mile, situate opposite to and within the limits of twenty miles of the section of said road and branches thus completed," and so on, as each section of ten miles was completed, until the end. It was then provided that, if the road was not constructed within ten years from the time the act went into effect, "the lands granted, or the grant of which is revived or extended by this act, and which at the time shall be unpatented to or for the benefit of the road or company, . . . shall revert to the

United States." By § 3 all lands "mentioned in this act, and hereby granted, are hereby reserved from entry, pre-emption, or appropriation to any other purpose than herein contemplated, for the said term of ten years from the passage of this act: *Provided,* that all lands heretofore given to the State of Missouri for the construction of the Cairo and Fulton railroad, or for the use of said road lying in the State of Missouri, and all lands proposed to be granted by this act for the use or in aid of the road herein named, and lying in said State of Missouri, shall be granted and patented to the said State whenever the road shall be completed through said State, which lands may be held by said State and used toward paying the State the amount of bonds heretofore issued by it to aid said company, and all interest accrued or to accrue thereon."

After the passage of this act of Congress, the railroad property was sold and conveyed by the State to certain persons, under whom the St. Louis, Iron Mountain and Southern Railway Company claims title. The conveyance upon the sale was of "the said Cairo and Fulton Railroad of Missouri, with all the franchise, privileges, rights, title and interest appertaining to said road, and all roads, road-bed, rolling stock, machine shops, and all other property, both real and personal, of every description, belonging or in any wise appertaining thereto."

The railroad was completed by the purchasers, or those claiming under them, and, on the 23d of January, 1877, the lands in dispute were patented, with others of the same class, to the St. Louis, Iron Mountain and Southern Company.

The first question presented by the assignment of errors is whether the act of July 28, 1866, was such a legislative declaration by Congress of a forfeiture of the grant of 1853 as would divest the title of the State to unearned lands, and defeat conveyances thereof by the railroad company before that time. It has often been decided that lands granted by Congress to aid in the construction of railroads do not revert after condition broken until a forfeiture has been asserted by the United States, either through judicial proceedings instituted under authority of law for that purpose, or through some legislative action legally equivalent to a judgment of office found at com-

mon law. *United States* v. *Repentingny*, 5 Wall. 211, 267, 268; *Schulenberg* v. *Harriman*, 21 Wall. 44, 63; *Farnsworth* v. *Minnesota & Pacific Railroad Co.*, 92 U. S. 49, 66; *M'Micken* v. *United States*, 97 U. S. 217, 218; *Van Wyck* v. *Knevals*, 106 U. S. 360. Legislation to be sufficient must manifest an intention by Congress to reassert title and to resume possession. As it is to take the place of a suit by the United States to enforce a forfeiture, and a judgment therein establishing the right, it should be direct, positive, and free from all doubt or ambiguity.

In the present case no such intention appears. On the contrary, the evident purpose of Congress was to waive a forfeiture and extend the time for earning the lands under the original act. The language is that the provisions of the act of 1853 be "revived and extended for the term of ten years from the passage of this act." If this had been all, no one could doubt that it was the intention of Congress to place all parties interested in the grant just where they would be if the act of 1853 had fixed July 28, 1876, as the time for the completion of the railroad. What follows does not, in our opinion, manifest any different intention. The words are: "and all the lands therein granted, which reverted to the United States under the provision of said act, be, and they are hereby, restored to the same custody, control and condition, and made subject to the uses and trusts in all respects as they were before and at the time such reversion took effect." When this act was passed the property of the original company had not been sold by the State under its act of February, 1866. There had been no proceedings by the United States to enforce a forfeiture, and the possession of the lands under the original grant had not been changed. Everything, so far as the United States were concerned, remained after the original limit of time for building the road had been passed, as it was before. Neither had the State done anything to take back its transfer of title to the company. Its legislation looked only to a sale and to the passing of the franchises and property of the company into the hands of those who would go forward and complete the road. This implied a preservation of the title of the com-

pany to the lands rather than its destruction. The language of the new act is to be construed with reference to these facts, and, inasmuch as there had not been in law any reversion of the lands to the United States when the act was passed, the words "reverted," "reversion," and "restored," are to be understood as implying nothing more than that no advantage was to be taken by the United States of the fact that the condition subsequent in the grant had been broken by the failure of the company to complete the road within the time originally limited. Certainly there is nothing in the language employed to show an intention of Congress by that act to declare a forfeiture. Taken as a whole, this provision of the act of 1866 amounts to nothing more than an amendment of the act of 1853, striking out the original time of limitation and inserting in lieu, July 28, 1876.

Other provisions of the act except from the grant of 1853, as well as that of 1866, all mineral lands within their respective limits, and also make patents necessary for the transfer of title from the United States. This shows an intention to take advantage of the breach of the conditions of the original grant, so far as was necessary to reassert title to, and reclaim possession of, any mineral lands that may have been included in that grant, and to change the mode of passing title, but it does not go further. To some extent, also, the obligations of the company for the transportation of the property and troops of the United States are changed. In this way the act of 1853 is amended, and the advantages, if any, gained by the United States may be looked upon as in the nature of concessions exacted in consideration of the additional grant which was made, and the extension of time which was given for the completion of the road. On the whole, we conclude that there has never been a forfeiture of the grant of 1853, so far as the lands now in dispute are concerned, and that the title of McGee stands precisely as it would if the original company had completed its road within the time fixed in the act of 1853. The purchasers at the sale made by the State in 1866 took subject to his rights, and the St. Louis, Iron Mountain and Southern Company got from these purchasers no better title than they had themselves.

Under these circumstances, the patent which issued in 1877 inured to the benefit of McGee just as it would if it had issued to the Cairo and Fulton Railroad before the transfer under which the new company claims.

The case of *Wilson* v. *Boyce*, 92 U. S. 320, is not in conflict with this. There the question was whether a purchaser from the company got title free of a lien of the State, as security for a loan of State bonds to the company. The controversy was about the construction of the words of description in the statute which created the State's lien; one side claiming that the land grant was not included, and the other that it was. If it was included, the title of the purchaser from the company would be bad; if not, it would be good. We held that the grant was included, and gave judgment accordingly. Upon the facts as presented by this record, no such question arises. No title is set up under any lien in favor of the State superior to that of McGee. There is no dispute about the right of the State to sell under its act of 1866. If, at the time of such sale, the title of the company under the act of 1853 had been divested by forfeiture, and the company held only under the new grant of 1866, the St. Louis, Iron Mountain and Southern Company is entitled to judgment. If, however, the original grant had not been forfeited, and the Cairo and Fulton Company held under that grant when the sale was made, the new company took title subject to the prior right of McGee, and must fail in this action. As we decide that the company held under the original title, the judgment of the Supreme Court of Missouri was right; and it is accordingly

*Affirmed.*